UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FLETCHER and BARTLOW GALLERY LTD., | ) | |
| | ) | |
| Plaintiffs, | ) | 13 C 3270 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| PETER DOIG, GORDON VENEKLASEN, MATTHEW S. DONTZIN, and THE DONTZIN LAW FIRM LLP, | ) ) | |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Robert Fletcher and Bartlow Gallery Ltd. brought this diversity suit against Matthew S.

Dontzin and The Dontzin Law Firm LLP (together, "Dontzin Defendants"), Gordon VeneKlasen,

and Peter Doig, seeking damages for their alleged tortious interference with Plaintiffs'

prospective economic advantage by taking action that scuttled the auction of a painting owned by

Fletcher, and also seeking a declaration that Doig painted the painting. Doc. 1. VeneKlasen and

the Dontzin Defendants have separately moved to dismiss the complaint under Federal Rules of

Civil Procedure 12(b)(2) and 12(b)(6). Docs. 22, 26. Doig has moved to dismiss under Rule

12(b)(2) or, in the alternative, on the basis of *forum non conveniens* in favor of a court in

Ontario, Canada. Doc. 34. The court grants the Dontzin Defendants' and VeneKlasen's

motions, dismissing the claims against them for lack of personal jurisdiction, and denies Doig's

motion.

**Background**

Because Doig has moved to dismiss only under Rule 12(b)(2) and *forum non conveniens*,

and because the court is dismissing the Dontzin Defendants and VeneKlasen under Rule 12(b)(2)

without reaching their Rule 12(b)(6) arguments, the relevant background includes not only the

complaint, but also the evidentiary materials submitted by both sides. No party has requested an evidentiary hearing, so the court must accept Plaintiffs' undisputed factual averments and must resolve all genuine factual disputes in Plaintiffs' favor. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423-24 (7th Cir. 2010); *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003); *Diamond Mortg. Corp. of Ill. v. Sugar*, 913 F.2d 1233, 1245 (7th Cir. 1990); *Saylor v. Dyniewski*, 836 F.2d 341, 342 (7th Cir. 1988).

Fletcher lives in Sault Ste. Marie, Ontario, Canada, and is a citizen of Canada, though he spends almost half his time in the United States. Doc. 1 at ¶ 2; Doc. 48-2 at ¶¶ 1, 3-4. Fletcher's girlfriend, eldest son, and parents live in Michigan, his sister lives in Indiana, and his brother lives in a Chicago suburb. Doc. 48-2 at ¶¶ 3, 5-7. Fletcher owns an untitled acrylic painting on linen signed "1976 Pete Doige," which depicts a desert scene with a pond ("the Work"). Doc. 1 at ¶¶ 1, 8. Here is a reproduction of the Work:



Doc. 22-3 at 6.

As described in detail below, Fletcher believes that Doig authored the Work in the mid-1970s. Doig is a renowned artist whose painting, *White Canoe*, sold at Sotheby's for a record-breaking $11.3 million in 2007, and who recently sold another painting, *The Architect's House in the Ravine*, for $12 million. Doc. 1 at ¶ 50. Doig has submitted an affidavit averring that he was born in 1959, that he lived in Canada from approximately 1966 to 1979, that he has resided in Trinidad since 2002, and that he is a citizen of Trinidad and Tobago. Doc. 34-2 at ¶¶ 2-3. Doig is represented professionally by VeneKlasen, an art dealer with the Michael Werner Gallery in New York City. Doc. 1 at ¶ 5; Doc. 34-2 at ¶ 7.

Fletcher maintains that he met Doig in 1975 or 1976 while taking college classes at Lakehead University in Thunder Bay, Ontario. Doc. 1 at ¶¶ 20-21. Fletcher was employed at the time as a correctional officer at Thunder Bay Correctional Center. *Id*. at ¶ 19. Fletcher claims that he met a fellow student at Lakeland who used the name "Pete Doige," who was seventeen years old, and who said that he was born in Scotland. *Id*. at ¶ 21. Fletcher believes that this individual was Doig; for the sake of clarity, the seventeen year-old fellow will be referred to as "Doige," with the court of course taking no position on the correctness of Fletcher's belief that Doige and Doig are the same person.

According to Fletcher, Doige dropped out of Lakeland after being sentenced to five months in the Thunder Bay Correctional Center for LSD possession. *Id*. at ¶¶ 22-23. While incarcerated, Doige became involved in the prison's art program, where he painted the Work. *Id*. at ¶ 24. Fletcher, who recognized Doige in the prison's admitting room, observed the Work in its various stages of completion. *Id*. at ¶¶ 22, 23. With Fletcher's assistance, Doige applied for and was granted parole, and Fletcher was assigned as his parole officer. *Id*. at ¶ 25. Fletcher helped Doige obtain employment with the Seafarers Union in Thunder Bay. *Id*. at ¶ 27. And Fletcher

encouraged Doige to keep pursuing art, and accepted Doige's offer to sell the completed Work to him for $100. *Id*. at ¶ 28.

Decades later, Fletcher came to believe that the Work was by Doig. *Id*. at ¶ 31. Fletcher consigned the Work to Bartlow Gallery, an art dealer in Chicago, and granted the gallery the exclusive right to market and sell the Work in exchange for a percentage of the proceeds. *Id*. at ¶ 9. The gallery is storing the Work in Chicago on Fletcher's behalf. *Id*. at ¶ 8. Peter Bartlow, the owner of Bartlow Gallery, conducted further research into the Work, and noted the following aspects of Doig's history that parallel Fletcher's recollection of Doige: Doig has publicly stated that he was born in the late 1950s in Scotland, that he emigrated to Canada as a young child, that he used LSD until he was nineteen years old, and that he was a "roustabout" in his late teens in western Canada before enrolling in art school in England in 1979. *Id*. at ¶ 32. Bartlow also believes the Work shares "uncanny commonalities in composition and execution with known works by Doig." *Ibid*.

On September 23, 2011, Bartlow sent an email inquiry to an address he believed to be Doig's, stating: "If you are Peter Doig please get in touch with Bob Fletcher from Thunder Bay. He has a painting of yours and might want to sell it but needs guidance on how to proceed. … Your privacy is of utmost concern, and we could use a little help." *Id*. at ¶¶ 17, 33. Bartlow also contacted VeneKlasen, Doig's art dealer, by phone. *Id*. at ¶ 34. Bartlow followed up with an email to VeneKlasen with further details about Fletcher's (alleged) acquaintance with Doig in Thunder Bay and the (alleged) resemblance of the Work to Doig's known paintings. *Id*. at ¶ 35.

On October 3, 2011, VeneKlasen, acting on Doig's behalf, emailed Bartlow denying that Doig knew Fletcher or had ever been to Thunder Bay, and stating that the Work "is absolutely not by Peter Doig." *Ibid*. VeneKlasen added: "Whatever [Fletcher] alleges is untrue. The

painting is NOT by Peter Doig.  Anyone can see that.  We are not interested in any further

communication related to this.  Good luck in finding the real artist for this.  Any attempt to

attribute this painting to Peter Doig in any way will be dealt with by our attorneys."  *Id*. at ¶ 36.

The same day, VeneKlasen wrote this in a separate email to Bartlow: "Further, Doig was 16 at

the time and enrolled first in Jarvis collegiate institute then SEED school.  Both in [T]oronto.

[H]opefully this will end surreal enquiry."  Doc. 22-4 at 6.  Bartlow wrote back to VeneKlasen

stating that he would end his inquiries if Doig could provide information disproving his

authorship of the Work.  Doc. 1 at ¶ 37.

　　　Doig and VeneKlasen are represented legally by The Dontzin Law Firm LLP, a New

York-based law firm, and Dontzin, an attorney and owner of the firm.  *Id*. at ¶¶ 1, 6, 15-16.  On

October 12, 2011, the Dontzin Defendants sent this letter to Bartlow, cc'ing VeneKlasen and

Doig:

> 　　　We write on behalf of Gordon VeneKlasen, who forwarded us your
> recent e-mails demanding 'either fair value' or 'an endorsement of
> authenticity' concerning a painting that your client, Robert Fletcher, claims to
> have purchased form Peter Doig in 1976. … [A]s Mr. VeneKlasen informed
> you by e-mail on October 3, 2011, after having consulted with Mr. Doig, "this
> work is absolutely not by Peter Doig."
>
> 　　　[Quoting VeneKlasen's October 3 email:] Not only does Mr. Doig
> not know the owner of this work, he has never been to the place it
> is supposedly painted.  Additionally, he did not even begin to paint
> on canvas until late 1979, well after this work was made.  The
> signature seems to be of someone named Noige, or Norge, but is
> definitely not the signature of Peter Doig.
>
> 　　　In response to Mr. VeneKlasen's email, you threatened to extort Mr.
> VeneKlasen and Mr. Doig unless they provide you with "concrete evidence"
> concerning the painting's authenticity.  In your October 1, 2011 e-mail, for
> example, you stated that "Mr. Fletcher is only interested in receiving a fair
> price for the painting, and does not wish to bring up anything which Mr. Doig
> would wish to remain private."  Similarly, on October 7, you accused Mr.
> Doig of having "used illegal drugs until 1978" and threatened that "[a] drug
> record makes things difficult" because "[a] person who enters the U.S. after

denying a drug conviction faces serious repercussions." You also accused Mr. Doig of having "fabricated elaborate records to gain admission to art school."

Your unfounded accusations and attempts to extort money or promises from Mr. VeneKlasen unless he authenticates Mr. Fletcher's painting are potentially criminal. Accordingly, we demand that you cease and desist from all communications with Mr. VeneKlasen, Mr. Doig, or anyone else at the Michael Werner Gallery. If you fail to do so, we will take whatever action we deem necessary to preserve their rights, including, without limitation, seeking the protection of the prosecutor's office and filing suit against you.

*Id*. at ¶ 15; Doc. 1-3 at 1-2.

On or about May 17, 2012, Leslie Hindman Auctioneers, Inc., a leading auction house based in Chicago, expressed to Plaintiffs an interest in auctioning the Work. Doc. 1 at ¶¶ 11, 39. Plaintiffs believe the Work could sell for more than $1 million and possibly more than $10 million if auctioned as a Doig painting. *Id*. at ¶ 60.

Dontzin avers that Leslie Hindman stated in a mid-May 2012 call to the Michael Werner Gallery that a Chicago dealer (presumably Bartlow Gallery) had offered the Work to her. Doc. 22-2 at ¶ 13. The Michael Werner Gallery referred the matter to the Dontzin Defendants, who responded on behalf of Doig and the Michael Werner Gallery in a letter to Hindman on May 16, 2012 (the "Dontzin-Hindman letter"). *Id*. at ¶ 14. The letter, which cc'ed VeneKlasen and Doig, stated:

We represent the Michael Werner Gallery (the "Gallery"). We understand that you have contacted Justine Birbil of the Gallery to inquire about a purported painting on canvas by Peter Doig (the "Painting"), which was offered to you by a dealer in Chicago. As Ms. Birbil explained to you, the Painting is absolutely not by Mr. Doig, as Mr. Doig himself has confirmed.

We understand that you have been advised by the dealer that the Painting is owned by Robert William Fletcher, who was allegedly given the Painting by Mr. Doig in 1976. As the Gallery explained to Peter Bartlow, a dealer in Chicago who approached the Gallery about the Painting last year, Mr. Doig does not know Mr. Fletcher and certainly never gave him any paintings. In addition, as the Gallery advised Mr. Bartlow, Mr. Doig did not

begin to paint on canvas until late 1979, well after the Painting was allegedly created.  Finally, the signature on the Painting appears to be of someone named Noige, or Norge, but is definitely not the signature of Peter Doig.

Under the circumstances, the Gallery will have no choice but to take legal action if the Painting is auctioned or otherwise sold as a work by Mr. Doig.

Doc. 22-5 at 2-3.  Doig avers that the Dontzin Defendants and VeneKlasen "acted with [his] authority to protect [his] right and interest in not having a piece of art that [he] did not create attributed to [him]," and that, "though [he] was not personally involved in every detail, [he] agree[s] with what [Defendants] … communicated to Mr. Bartlow and Ms. Hindman."  Doc. 34-2 at ¶¶ 18, 20.  As a result of receiving this letter, Hindman Auctioneers decided not to auction the Work.  Doc. 1 at ¶ 41.

Plaintiffs then filed this suit against Doig, VeneKlasen, and the Dontzin Defendants.  Doc. 1.  Count I alleges that "Defendants, by the action of Dontzin, acting as agent for Dontzin Firm, Doig and VeneKlasen, interfered with Plaintiffs['] prospective economic advantage by writing to Leslie Hindman Auctioneers, Inc. in or about May, 2012," "with the knowledge of the falsity of the assertions in the letter …, and with the intention to stop Leslie Hindman Auctioneers … from auctioning the Work on behalf of plaintiffs."  *Id*. at ¶¶ 55-56.  Count II seeks a declaratory judgment "[d]eclaring the right of plaintiffs, and any agents of either of the plaintiffs, to attribute the Work to Peter Doig, including such attribution in relation to a private or auction sale of the Work, without interference by defendants and/or any of their agents."  *Id*. at 15.

The plot since has thickened.  Suyash Agrawal, counsel for Defendants, has submitted an affidavit averring that on August 26, 2013, he met with Marilyn Doige Bovard, the sister of a man named Peter Edward Doige (who will be referred to by his full name), who was born in

April 1955 and who died in February 2012 in Alberta, Canada. Doc. 34-4 at ¶ 5. Bovard resides in Hinton, Alberta. *Ibid.* She signed an affidavit averring that her brother, a carpenter by trade, attended Lakehead University and served a jail sentence at Thunder Bay Correctional Center in the 1970s. Doc. 34-5 at 4-5. Bovard showed Agrawal her brother's original Lakehead University student identification card from 1976. Doc. 34-4 at ¶ 6; Doc. 34-6 at 1. Bovard avers that she "recall[ed] Peter telling [her] that, while he was an inmate at Thunder Bay, he took painting and music classes," and also that he "did music and art" throughout his life. Doc. 34-5 at 4-5. Bovard further avers that she has some of her brother's other paintings, including an acrylic painting of a desert scene. *Id.* at 5.

William Zieske, counsel for Plaintiffs, has submitted an affidavit averring that he spoke with Gwendolyn Woolwine, the mother of Peter Edward Doige and Bovard. Doc. 48-3 at ¶ 12. Woolwine lives in Challis, Idaho. *Id.* at ¶ 17. On September 2, 2013, Woolwine told Zieske that she believed that her son had been incarcerated in Florida, not in Canada; that he grew up in the Atlantic provinces of Canada and did not spend time in Ontario or Thunder Bay; that he painted very little; and that he never attended college. *Id.* at ¶ 13.

**Discussion**

**I.     Doig's Motion to Dismiss**

    **A.     Rule 12(b)(2)**

Doig contends that he is not subject to personal jurisdiction in Illinois because he "had zero contacts with anyone in Illinois" and "Plaintiffs cannot point to any contact that Doig *directly* made with anyone in this forum." Doc. 34-1 at 13 (emphasis added). That argument is without merit. Because "the acts of an agent may be considered to be acts of the principal" in determining the principal's contacts with Illinois, *Stein v. Rio Parismina Lodge*, 695 N.E.2d 518,

522 (Ill. App. 1998), the Dontzin Defendants' and VeneKlasen's contacts with Illinois are imputed to Doig for purposes of the personal jurisdiction inquiry. *See Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994) (holding that whether or not an agent can be sued in Illinois, "his superiors, who sent him, can be by virtue of his having come into the state on their business"); *Stauffacher v. Bennett*, 969 F.2d 455, 459 (7th Cir. 1992) ("[I]f Livesey was the agent of the enterprise, what more should be necessary to bring the enterprise, and hence First Heritage, a principal in it, within the long arm of the long-arm statute?"). Accordingly, the pertinent question here is whether the Dontzin Defendants' and VeneKlasen's contacts with Illinois—which, as discussed below in Section II, were taken on Doig's behalf—are sufficient to support the exercise of personal jurisdiction over Doig.

A federal court's "exercise of jurisdiction over the defendant must be authorized by the terms of the forum state's personal-jurisdiction statute and also must comport with the requirements of the Fourteenth Amendment's Due Process Clause." *Felland v. Clifton*, 682 F.3d 665, 672 (7th Cir. 2012); *see also N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014). The Illinois long-arm statute permits a court to exercise personal jurisdiction "on any … basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2–209(c). Because "there is no operative difference between these two constitutional limits," a federal court sitting in Illinois and evaluating a Rule 12(b)(2) motion must ask "whether the exercise of personal jurisdiction would violate federal due process." *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). "The plaintiff bears the burden of establishing personal jurisdiction when the defendant challenges it. Where, as here, the district court rules on a defendant's motion to dismiss based on the submission of written materials without holding an

evidentiary hearing, the plaintiff need only make out a *prima facie* case of personal jurisdiction." *N. Grain Mktg.*, 743 F.3d at 491 (internal quotation marks and citation omitted).

"Under the Supreme Court's well-established interpretation of the Fourteenth Amendment's due process clause, a defendant is subject to personal jurisdiction in a particular state only if the defendant had certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Mobile Anesthesiologists Chicago*, 623 F.3d at 443 (internal quotation marks omitted). The Supreme Court has "framed the constitutional inquiry in terms of whether the defendant purposefully avails itself of the benefits and protections of conducting activities in the forum state." *Id.* at 444 (internal quotation marks omitted). To be subject to personal jurisdiction, "[t]he defendant's contacts must not be merely random, fortuitous, or attenuated; rather, the 'defendant's conduct and connection with the forum state' must be such that it should 'reasonably anticipate being haled into court there.'" *Citadel Grp. Ltd. v. Wash. Reg. Med. Ctr.*, 536 F.3d 757, 761 (7th Cir. 2008) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).

"Personal jurisdiction can be general or specific, depending on the extent of the defendant's contacts." *Mobile Anesthesiologists Chicago*, 623 F.3d at 444; *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 754-55 (2014). Plaintiffs here pursue only a specific jurisdiction theory. Doc. 1 at ¶ 13; Doc. 48 at 5. When determining whether specific personal jurisdiction is present, the "relevant contacts are those that center on the relations among the defendant, the forum, and the litigation." *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 801 (7th Cir. 2014). "The mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction. Furthermore, the relation between the defendant and the forum must arise out of contacts that the defendant

*himself* creates with the forum." *Ibid*. (internal quotation marks and citations omitted, alteration in original). Consistent with these principles, the Seventh Circuit has held that "[s]pecific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities. The exercise of specific jurisdiction must also comport with traditional notions of fair play and substantial justice." *N. Grain Mktg.*, 743 F.3d at 492 (internal quotation marks and citations omitted); *see also Advanced Tactical Ordnance Sys.*, 751 F.3d at 802-03.

There is no dispute that Plaintiffs' alleged injury arises out of Doig's forum-related activities; the alleged injury—the auction's cancellation—is plausibly alleged to have been both directly ("but for") and proximately (foreseeably) caused by Defendants' communications to Illinois. The disputed questions here are whether Doig "purposefully directed" his conduct at Illinois, and whether Illinois's exercise of personal jurisdiction over Doig would offend traditional notions of fair play and substantial justice. Those questions are addressed in turn.

### 1.      "Purposefully Directed" Requirement

Where, as here, the plaintiff alleges an intentional tort, the purposeful-direction inquiry "focuses on whether the conduct underlying the claims was purposely directed at the forum state." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2009). The Seventh Circuit has "distilled three requirements from *Calder* [*v. Jones*, 465 U.S. 783 (1984),] for determining whether conduct was 'purposefully directed' at the forum state: '(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state.'" *Felland v. Clifton*, 682 F.3d 665, 674-75 (7th Cir. 2012) (quoting *Tamburo*,

601 F.3d at 703). "If the plaintiff makes these three showings, he has established that the defendant 'purposefully directed' his activity at the forum state." *Id*. at 675. Plaintiffs have made those showings.

With respect to the first element, Plaintiffs allege that the Dontzin Defendants' sending the May 16, 2012 letter to Hindman Auctioneers "was willfully and wantonly performed by defendants, with knowledge of the falsity of the assertions in the letter to Leslie Hindman Auctioneers, Inc. denying Doig's execution of the Work, and with the intention to stop Leslie Hindman Auctioneers, Inc. from auctioning the Work on behalf of plaintiffs." Doc. 1 at ¶ 56. That is sufficient to satisfy the "intentional and allegedly tortious" element. *See Tamburo*, 601 F.3d at 704 ("Tamburo … further alleges that this conduct tortiously interfered with his business …. These are intentional-tort allegations, bringing this case squarely within the *Calder* formula[.]"); *O'Fallon Dev. Co. v. City of O'Fallon*, 356 N.E.2d 1293, 1301 (Ill. App. 1976) ("Tortious interference with prospective economic advantage is an intentional tort.").

The second element, whether the conduct was expressly aimed at the forum State, "overlaps with [the third element, which asks] whether the defendant knew the plaintiff would suffer the injury in the forum state, so [the court will] consider the two requirements together." *Tamburo*, 601 F.3d at 704. For many years, the "expressly aimed" standard was in flux in the Seventh Circuit, with *Tamburo* recognizing "some tension regarding the proper reading of *Calder*" between *Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985), and *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997). 601 F.3d at 704. The Seventh Circuit ultimately sided with *Wallace*, which considers "the relationship between the allegedly tortious conduct and the forum state itself." *Tamburo*, 601 F.3d at 706; *see Mobile Anesthesiologists*, 623 F.3d at 445. That choice was vindicated by *Walden v. Fiore*, 134 S. Ct. 1115 (2014), which in holding that "the

defendant's suit-related conduct must create a substantial connection with the forum State," emphasized that "it is the defendant's conduct that must form the necessary connection with the forum State" and that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Id*. at 1121-23; *see also Advanced Tactical Ordnance Sys.*, 751 F.3d at 802 ("Although [*Janmark* and *Wallace*] may be in some tension with one another, after *Walden* there can be no doubt that 'the plaintiff cannot be the only link between the defendant and the forum.'") (quoting *Walden*, 134 S. Ct. at 1122).

As required by *Walden*, Plaintiffs allege that Doig engaged (through his agents) in tortious conduct directed at the Illinois forum *and* a forum-state injury. *See Tamburo*, 601 F.3d at 706 ("This case involves both a forum-state injury *and* tortious conduct specifically directed at the forum, making the forum state the focal point of the tort."). Doig contacted Hindman via a letter to Illinois expressly denying that Doig created the Work, thereby causing the alleged harm—the cancellation of the auction of the Work and loss of a lucrative opportunity. Doc. 1 at ¶¶ 40-41. There is ample evidence that Doig specifically directed this conduct at Illinois and knew that the brunt of the harm would be felt there. VeneKlasen apprised Doig of Bartlow's inquiries from the very beginning, and Bartlow's Chicago address was noted at the bottom of all his emails, including the September 2011 email to Doig, Doc. 22-3 at 4; and Doig avers that he "reviewed the e-mail correspondence from Mr. Bartlow and conferred with Mr. VeneKlasen," Doc. 34-2 at ¶ 11. Additionally, Doig had reviewed and was cc'ed on the Dontzin Defendants' October 12, 2011 letter to Bartlow, which displayed Bartlow's Chicago address. Doc. 1-3 at 1; Doc. 34-2 at ¶ 14. Likewise, Doig reviewed and was cc'ed on the Dontzin Defendants' letter to Hindman Auctioneers, which displayed Hindman's Chicago address. Doc. 22-5 at 2; Doc. 34-2 at ¶ 16. Given these facts, it is beyond dispute that Doig knowingly directed his conduct to

Illinois.  *See Felland*, 682 F.3d at 675 (holding that "there is no doubt that Clifton knew the alleged harm would be felt in Wisconsin," given that "Clifton and his associates knew from the beginning that the Fellands were Wisconsin residents; their Wisconsin residency was noted in various documents possessed and signed by Clifton; and Clifton directed multiple communications via several different media to the Fellands' Wisconsin home").

There is a forum-state injury as well, as the economic consequences of Doig's conduct were felt in Illinois when Bartlow Gallery allegedly lost out on a potential seven-figure auction of the Work.  The Seventh Circuit in *Tamburo* cited with approval *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (10th Cir. 2008), a case with facts analogous to those here.  *Tamburo*, 601 F.3d at 706-08.  *Tamburo* summarized *Dudnikov* as follows:

> In *Dudnikov* a Connecticut-based company notified the online auction host eBay, based in California, that a line of prints featured in an eBay auction infringed its copyright.  eBay responded by cancelling the auction for the prints.  The online sellers of the prints lived and operated their business in Colorado; they filed a copyright suit in Colorado against the Connecticut-based company.  The district court dismissed the case for lack of personal jurisdiction. … In a comprehensive decision, the Tenth Circuit reversed.  Although the Connecticut company's conduct originated outside of Colorado and was technically directed at eBay in California, its express goal was to halt sales of an online auction item originating in Colorado.  This satisfied *Calder*'s "express aiming" requirement and was sufficient to establish personal jurisdiction over the Connecticut company in Colorado.

*Id*. at 706-07.  As *Dudnikov* itself explained:

> [The defendant's conduct] is something like a bank shot in basketball.  A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket.  Here, defendants intended to send the [copyright notice] to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado.  Their "express aim" thus can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket.

514 F.3d at 1075. Likewise, although Doig's conduct originated outside of Illinois, he targeted Fletcher and his dealer Bartlow Gallery, whose business was in Illinois, with the express goal of inflicting commercial harm there. *See Tamburo*, 601 F.3d at 707 (finding a forum-state injury in Illinois where "the individual defendants purposely targeted Tamburo and his business in Illinois with the express goal of inflicting commercial and reputational harm on him there").

For these reasons, Plaintiffs have satisfied the "purposefully directed" requirement with respect to Doig. In so holding, the court rejects Doig's argument that "the Dontzin-Hindman Letter was a cease-and-desist letter, and such letters, alone, do not support the exercise of personal jurisdiction over an out-of-state defendant." Doc. 56 at 16. The allegedly tortious conduct extends well beyond a simple cease-and-desist letter—among other things, Doig's agents sent a letter to a non-party, Hindman Auctioneers, disclaiming his authorship of the Work, which scuttled the planned auction—rendering inapposite the authorities cited by Doig and obviating any need to determine whether they apply outside the trademark infringement context.

### 2. Fair Play and Substantial Justice

Having found that Plaintiffs' injury arises out of Doig's forum-related activities and that he purposefully directed his conduct at Illinois, the court turns to the question whether exercising personal jurisdiction over Doig would comport with "fair play and substantial justice." The following factors govern that inquiry: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Tamburo*, 601 F.3d at 709 (quoting *Burger King*, 471 U.S. at 477) (internal quotation

marks omitted). Applying these factors, the court concludes that exercising jurisdiction over Doig in Illinois would not offend traditional notions of fair play and substantial justice.

First, it cannot be denied that Doig, who resides in Trinidad, will be burdened by litigating in Illinois. But Doig also would equally if not more burdened if this case were litigated in Ontario, his preferred forum. Thus, the first factor is inconclusive.

The second factor, Illinois's interest in adjudicating the dispute, favors Plaintiffs. As the Seventh Circuit has observed, "Illinois has a strong interest in providing a forum for its residents and local businesses to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors." *Ibid*. Bartlow Gallery, an Illinois business, has allegedly suffered a significant economic loss, and it is in Illinois's interest to provide a forum for it to seek redress.

The third and fourth factors, Plaintiffs' interest in obtaining convenient and effective relief, and the interstate judicial system's interest in obtaining efficient resolutions of controversies, also favor Plaintiffs. Doig contends that "all of the key evidence that Plaintiffs profess to need"—including records from Canadian institutions such as the Lakehead University, Thunder Bay Correctional Center, the Seafarer's Union, the Thunder Bay Police Service, and the Royal Canadian Mounted Police, which may shed light on whether Doig or Peter Edward Doige was the Doige that Fletcher knew in the 1970s—"is located in Ontario and elsewhere in Canada." Doc. 34-1 at 16. Doig's argument is overstated. Although it will undoubtedly be more difficult for an American court than for a Canadian court to obtain records located in Canada, it is by no means impossible or unreasonably difficult. Docs. 34-3, 56-3 (explaining the procedure that Illinois courts must follow to obtain Canadian records). And Doig does not suggest that an Illinois federal court would somehow face greater difficulty obtaining Canadian evidence than, say, a federal or state court in New York, which obviously would have personal

jurisdiction over Defendants. Furthermore, the Work, Bartlow Gallery, and Hindman are located in or near Chicago. Finally, this court is capable of expeditiously resolving the dispute, given that it probably involves Illinois substantive law. In sum, the most efficient resolution of this dispute is likely to occur in an Illinois courtroom.

The fifth factor is a wash, as it does not appear that Canada, Trinidad and Tobago, or the United States have a substantial interest at stake here. *See Abad v. Bayer Corp.*, 563 F.3d 663, 668 (7th Cir. 2009) ("For this is ordinary private tort litigation that 'implicates,' as some judges like to say, no national interest.").

\*    \*    \*

Because Doig purposefully directed his actions towards Illinois, and because this court's exercise of personal jurisdiction over Doig comports with traditional notions of fair play and substantial justice, specific jurisdiction lies over Doig, and his Rule 12(b)(2) motion is denied.

### B.    *Forum Non Conveniens*

Doig argues in the alternative that this case should be dismissed on the basis of *forum non conveniens* in favor of a court in Ontario. This argument fails as well.

"The common law doctrine of *forum non conveniens* allows a federal district court to dismiss a suit over which it would normally have jurisdiction in order to best serve the convenience of the parties and the ends of justice." *Stroitelstvo Bulgaria Ltd. v. Bulgarian-Am. Enter. Fund*, 589 F.3d 417, 421 (7th Cir. 2009); *see also Clerides v. Boeing Co.*, 534 F.3d 623, 627-28 (7th Cir. 2008); *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005). "A federal court has discretion to dismiss a case on the ground of *forum non conveniens* when an alternative forum has jurisdiction to hear [the] case, and … trial in the chosen forum would establish … oppressiveness and vexation to a defendant … out of all proportion to plaintiff's

convenience, or … the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (internal quotation marks omitted and alterations in original). "A threshold requirement for any *forum non conveniens* dismissal is the existence of an alternative forum that is both 'available' and 'adequate.'" *Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 421 (citation omitted). Plaintiffs do not dispute that Ontario is an available alternative forum. Doc. 48 at 33. "If an adequate alternative forum exists, the district court should consider whether a *forum non conveniens* dismissal would serve the private interests of the parties and the public interests of the alternative forums." *Stroitelstvo Bulgaria*, 589 F.3d at 424.

The private and public interest factors identified in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947), guide the court's analysis:

> The private interest factors that a court may consider include the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. … The public interest factors include the administrative difficulties stemming from court congestion; the local interest in having localized disputes decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Stroitelstvo Bulgaria*, 589 F.3d at 425 (internal quotation marks omitted and alteration in original). A "defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum." *In re Hudson*, 710 F.3d 716, 718 (7th Cir. 2013) (internal quotation marks omitted). There is "a presumption in favor of allowing a plaintiff his choice of courts rather than insisting that he choose the optimal forum," and "[a] case should not be lightly shifted from one court to another, forcing the plaintiff to start over." *Abad*, 563 F.3d at

666.  It is true that "[w]hen the plaintiff's choice is not its home forum, … the presumption in the plaintiff's favor applies with less force, for the assumption that the chosen forum is appropriate is in such cases less reasonable," *Sinochem Int'l*, 549 U.S. at 430 (internal quotation marks omitted), but that principle has no application here because Illinois is the home forum of one of the two plaintiffs, Bartlow Gallery.

### 1.  Private Interest Factors

#### a.  Ease of Access to Sources of Proof

The ease of access to sources of proof slightly favors dismissal.  Plaintiffs recognize that they "will require some discovery in Canada to determine whether they should proceed with their claims, now that Defendants have inserted the issue of the deceased carpenter, Peter Edward Doige, into this case."  Doc. 48 at 38.  Among the records sought would be those pertaining to Doige's identity and to the Canadian whereabouts in the mid- to late 1970s of Doig and Peter Edward Doige.  Doig has submitted affidavits from a Toronto lawyer, Docs. 34-3, 56-3, averring to the difficulties in "gathering this proof … when channeled across the border through the U.S. courts than if the case were pending in Ontario in the first place."  Doc. 34-1 at 22.  The lawyer explains that the Ontario Freedom of Information and Protection of Privacy Act ("FIPPA") governs the ability to obtain documents without an Ontario court order from government institutions in Ontario, including Lakehead University, Thunder Bay Correctional Center, and Thunder Bay Police Service.  Doc. 56-3 at ¶¶ 7-8, 11.  FIPPA does not permit a government institution to disclose personal information, such as records of employment and educational history, unless the information is requested by the individual to whom it relates.  *Id*. at ¶ 12.  If the individual is deceased, FIPPA allows a "close relative or spouse" to request the information for "compassionate reasons," such as to seek information surrounding the individual's death.  *Id*.

at ¶¶ 15-16.  The lawyer does not believe that any documents pertaining to this case would qualify as information "for compassionate reasons."  *Id*. at ¶ 16.  In any event, the parties indicated at a hearing, Doc. 58, that they do not believe that Woolwine, Peter Edward Doige's mother, would cooperate in consenting to the release of his records, and they dispute whether Bovard, his sister, would cooperate.

That said, the Toronto lawyer also avers that FIPPA does not affect "the power of a court … to compel a witness to testify or compel the production of a document," and that, "as a result, the parties can obtain access to personal information from institutions governed by FIPPA if they successfully obtain an Ontario court order."  Doc. 56-3 at ¶ 20.  The party seeking the documents must first obtain letters of request, or "letters rogatory," from the U.S. District Court setting forth the details of the requested evidence, and the moving party must then commence a proceeding in Ontario to have the letters of request enforced by an Ontario court.  Doc. 34-3 at ¶ 51.  The Ontario court may enforce the U.S. District Court's letters of request after an oral hearing supported by affidavit evidence, or during a trial where witnesses testify regarding the evidence.  *Id*. at ¶ 52.  In deciding whether to enforce the letters of request, the Ontario court considers the relevance of the evidence, whether the evidence is otherwise unavailable, whether providing the evidence would violate public policy, and whether non-party witnesses would be unduly burdened, and the court issue an order modifying the request as it deems necessary.  *Id*. at ¶¶ 56-57.  The Toronto lawyer avers that, in his experience, "the process of enforcing letters of request in Ontario increases the overall cost of the litigation and the length of time necessary to obtain relevant information," and notes that further cost and delay could be incurred if an Ontario court were "not satisfied with the detail and clarity provided in the letters of request" and asked for revised letters of request from the U.S. District Court.  *Id*. at ¶ 58.  (The court acknowledges that

the Toronto lawyer's affidavit, while admissible under Rule 44.1, may be less authoritative than published materials on Canadian law, *see Sunstar, Inc. v. Alberto-Culver Co.*, 586 F.3d 487, 495-96 (7th Cir. 2009), but the affidavit suffices here because the parties largely agree on the content of the relevant Canadian legal principles.)

Following this process certainly may impose some inconvenience, but the court does not believe that the process is so burdensome as to strongly favor dismissal. *See Boston Telecommunications Grp., Inc. v. Wood*, 588 F.3d 1201, 1208 (9th Cir. 2009) ("But if this case proceeds in California, Wood may seek these documents through procedures for international third-party discovery, such as those under the Hague Convention on Taking of Evidence Abroad in Civil or Commercial Matters, 23 U.S.T. 2555 (1968). 'Any court … will necessarily face some difficulty in securing evidence from abroad,' but these complications do not necessarily justify dismissal."); *Reid-Walen v. Hansen*, 933 F.2d 1390, 1398 (8th Cir. 1991) (holding that a *forum non conveniens* dismissal was an abuse of discretion because "[n]either the Hansens nor the district court have specified what sources of proof are available *only* in Jamaica. … Presumably, any records of safety precautions the Hansens did or did not undertake could be transported [from Jamaica] to Missouri.") (emphasis added); *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 639 (3d Cir. 1989) (same, where the "West German courts have indicated that they will execute letters rogatory for pretrial discovery to the extent that they would order such evidence if the case were tried in their own courts"). Moreover, it would be relatively easy to obtain records from Canada pertaining to Doig's own educational history and criminal record (if any) while he lived in that country, as all that would be required is Doig's consent, which the court has no reason to be believe that he would withhold. Accordingly, while this factor favors dismissal, it does so only slightly.

### b. Compelling Attendance of Unwilling Witnesses

The second factor, the availability of the compulsory process for the attendance of unwilling witnesses, is neutral. Aside from Bovard, Doig lists numerous potential witnesses from Canada: "representatives from Lakehead University, the Thunder Bay Correctional Center, the Thunder Bay Probation and Parole Office, the Seafarer's Union in Ontario, the Thunder Bay police, the Royal Canadian Mounted Police, and the schools that Doig attended during the period in question (Jarvis/S.E.E.D)." Doc. 34-1 at 23. However, those non-party witnesses could be compelled to give video depositions via the letters rogatory process described above. *See DiRienzo v. Philip Services Corp.*, 294 F.3d 21, 30 (2d Cir. 2002) (recognizing "the availability of letters rogatory as relevant in deciding whether plaintiffs' chosen forum is inconvenient," and noting that "[w]hile demeanor evidence is important when trying a fraud case before a jury ..., videotaped depositions, obtained through letters rogatory, could afford the jury an opportunity to assess the credibility of these Canadian witnesses"); *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 169 (2d Cir. 1991) ("[A]ny testimony MG needs from witnesses whose attendance cannot be compelled can be obtained, for example, through the use of letters rogatory. ... Therefore, while certain of MG's interests may favor trial in India, they are not sufficiently weighty to dislodge Maganlal from its chosen forum."); *Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 47 (3d Cir. 1988) (holding that a *forum non conveniens* dismissal was an abuse of discretion where the "potential witnesses in British Columbia who are not subject to compulsory process in Pennsylvania, such as the pilot, have made themselves available for deposition"). There would be little value from live testimony (as opposed to videotaped depositions) for the representatives from various Canadian institutions, whose role would be simply to confirm the attendance records and educational history of Doig and/or Peter Edward Doige.

It is true that live testimony from Bovard would have slightly more impact than videotaped testimony. But if the case proceeded in Ontario, the Canadian courts would be unable to compel the live attendance of Woolwine, who lives in Idaho, whose story differs from Bovard's, who has expressed reluctance to cooperate, and who (like Bovard) would testify, if at all, by video deposition. As for these two key non-party witnesses, then, this factor is a wash. *See Reid-Walen v. Hansen*, 933 F.2d 1390, 1397 (8th Cir. 1991) ("In whichever forum the case is tried, witnesses will have to travel or testify by deposition. If the suit is brought in the U.S., the parties will not have compulsory process over any Jamaican witnesses. By the same token, if the suit is brought in Jamaica, the parties will lack compulsory process over American witnesses.").

### c.    Cost of Obtaining Attendance of Willing Witnesses

This factor weighs slightly against dismissal. Willing witnesses identified by Plaintiffs include Fletcher, Bartlow, and art experts based in Chicago. Doc. 48 at 40-42. Willing witnesses identified by Doig include the Dontzin Defendants and VeneKlasen, who are based in New York, and Doig, who is based in Trinidad. Doig does not dispute that, with respect to the Dontzin Defendants and VeneKlasen, "it is cheaper to fly from New York City to Chicago than to either Thunder Bay or Toronto." Doc. 48 at 41; *see also* Doc. 48-3 at ¶ 21 (comparing a $188 flight from New York City to Chicago, to a $334 flight from New York City to Toronto, or a $597 flight from New York City to Thunder Bay); Doc. 56 at 29. If the case were tried in Ontario, it would be costly for Bartlow and the Chicago-based art experts to travel to Canada. Doc. 48-3 at ¶¶ 18-19, 21. Because it would be slightly more expensive to obtain the attendance of willing witnesses if the case were dismissed and refiled in Ontario, this factor weighs slightly in favor of staying in Illinois.

### d. Viewing the Premises and Other Practical Problems

The parties do not dispute that the fourth private interest factor, viewing the premises, has no application here. As for "all other practical problems that make trial of a case easy, expeditious and inexpensive," *Stroitelstvo Bulgaria Ltd.*, 589 F.3d at 425 (internal quotation marks omitted), Doig merely rehashes his argument that it may be inconvenient to obtain information from Canadian institutions through letters rogatory. Doc. 34-1 at 25. The court has already found that this consideration at best weighs only slightly in favor of dismissal.

Overall, then, the private interest factors are essentially neutral.

### 2. Public Interest Factors

The first public interest factor, court congestion, is neutral. As of June 2014, the median time from filing a civil case to trial in the Northern District of Illinois was 35.4 months. *See* Federal Court Management Statistics, www.uscourts.gov/Statistics/FederalCourtManagement Statistics.aspx, then click on "District Courts," then select "Illinois Northern" (last viewed September 26, 2014). The Toronto lawyer avers that in Ontario, "in most cases, it would take at least nine (9) months, but more commonly two years or more from the time a claim is commenced [in Ontario] before a matter proceeds to trial." Doc. 34-3 at ¶ 25. As Plaintiffs correctly note, "[t]he general time intervals that Mr. Capern provides is open-ended," such that "there is no actual comparison to be made for purpose of assessing relative court congestion." Doc. 48 at 43. Without more information with which to make a comparison, this factor is neutral. *See Clerides*, 534 F.3d at 630 ("The court did not have sufficient evidence to enable it to assess the congestion of the courts in Greece or Cyprus, but, given that the current median time to trial in the Northern District of Illinois is twenty-four months, the judge reasonably concluded that, at best, this factor would be neutral.").

The second public interest factor, "the local interest in having localized disputes decided at home," is neutral, as both Illinois and Canada have an interest in resolving this dispute locally. As noted above, Illinois has such an interest because it is the site of the alleged injury and where Bartlow Gallery conducts business. *See Tamburo*, 601 F.3d at 709 ("Illinois has a strong interest in providing a forum for its residents and local businesses to seek redress for tort injuries suffered within the state and inflicted by out-of-state actors."). Canada also has an interest in resolving the dispute, as Fletcher is a citizen of Canada, and the case may turn on whether another Canadian citizen, Peter Edward Doige, authored the Work.

Doig concedes that "the remaining public interest factors … do not significantly impact the analysis," Doc. 34-1 at 26, and thus the court need not consider them. On balance, the private and public interest factors are neutral and do not weigh in favor of dismissal. And even if the private interest factors slightly favored dismissal, that would be insufficient for a *forum non conveniens* dismissal. *See Clerides*, 534 F.3d at 628 ("As a general rule, a plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant."); *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 524 (7th Cir. 2001) ("under the usual analysis, there is a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum … , and this is particularly true where a domestic plaintiff has filed suit in his own home forum") (internal quotation marks and citation omitted).

## II.     Dontzin Defendants' and VeneKlasen's 12(b)(2) Motions

As shown in Section I.A above, the Dontzin Defendants' and VeneKlasen's contacts with Illinois are sufficient to support the exercise of personal jurisdiction over them. Those defendants, however, seek refuge from suit in Illinois under Illinois's fiduciary shield doctrine.

"[R]ecognized by the courts of many states including Illinois," the fiduciary shield doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 912 (7th Cir. 1994); *see also ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 550 (7th Cir. 2001) ("Illinois employs the fiduciary-shield doctrine, under which a person who enters the state solely as fiduciary for another may not be sued in Illinois.") (citation omitted). "[T]he fiduciary-shield doctrine is a matter of state law only," and does not flow from federal due process principles. *Hardin Roller Corp. v. Universal Printing Mach., Inc.*, 236 F.3d 839, 842 (7th Cir. 2001); *see also Newsome v. Gallacher*, 722 F.3d 1257, 1278 (10th Cir. 2013) ("[T]he Supreme Court has made clear that the fiduciary shield is a question of state law, not due process."); *Columbia Briargate Co. v. First Nat. Bank in Dallas*, 713 F.2d 1052, 1057 (4th Cir. 1983) (same); *see generally* Robert A. Koenig, "Personal Jurisdiction and the Corporate Employee: Minimum Contacts Meet the Fiduciary Shield," 38 *Stan. L. Rev.* 813, 819-21 (1986) (describing the doctrine's origins and noting that "Supreme Court opinions seem to reject outright the constitutional underpinnings of the rule"). So even where, as here, federal due process would permit the court's exercise of personal jurisdiction over a defendant, the fiduciary shield doctrine may nevertheless preclude it. *See Hardin Roller Corp.*, 236 F.3d at 842; *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 779 (7th Cir. 2003) ("A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction.").

The Supreme Court of Illinois recognized the doctrine in *Rollins v. Ellwood*, 565 N.E.2d 1302, 1318 (Ill. 1990), a case in which two Baltimore police officers traveled to Illinois to arrest a suspected fugitive pursuant to a warrant. *Id*. at 1305. As it turned out, they nabbed the wrong

26

man.  *Ibid*.  The arrestee (Rollins) filed suit in Illinois against one of the officers (Ellwood),

alleging that he committed the intentional torts of kidnapping, unlawful restraint, and conspiracy.

*Id*. at 1304.

The Supreme Court of Illinois held that Ellwood should be dismissed as a defendant on

the ground that it would be "unfair and unreasonable … to assert personal jurisdiction over an

individual who seeks the protection and benefits of Illinois law, not to serve his personal

interests, but to serve those of his employer or principal."  *Id*. at 1318.  The court reasoned as

follows:

> Ellwood entered into Illinois, and while in Illinois engaged in conduct giving
> rise to the present cause of action, solely in his capacity as a police officer
> acting for the Baltimore police department and the State of Maryland.  The
> nature and quality of his actions in Illinois were defined and characterized by
> his status as a police officer employed by these entities.  Because Ellwood's
> conduct in Illinois was a product of, and was motivated by, his employment
> situation and not his personal interests, we conclude that it would be unfair to
> use this conduct to assert personal jurisdiction over him as an individual.

*Ibid*.  The court rejected the argument that "asserting personal jurisdiction over an employee who

acted in the scope of his employment is justified because the employee is serving his own

financial interests when he performs the tasks imposed upon him by his employer," explaining

that "[i]n practical terms, an employee, especially one in Ellwood's position, has little or no

alternative besides unemployment when ordered to enter another State to carry out the wishes of

his employer," and that there was "no reason to fashion an exception to the fiduciary shield

doctrine that will expose employees who engage in tortious conduct within the scope of their

employment to the personal jurisdiction of Illinois courts."  *Ibid*.

As *Rollins* makes clear, "[t]he shield is withdrawn if the agent was acting also or instead

on his own behalf—to 'serve his personal interests.'"  *Rice*, 38 F.3d at 912 (quoting *Rollins*, 565

N.E.2d at 1318).  At a hearing on the motion to dismiss, Doc. 58, Plaintiffs conceded that they do

not contend that the Dontzin Defendants and VeneKlasen were acting to serve their personal interests when they communicated to Bartlow Gallery and Hindman in Illinois. Plaintiffs conceded the same point in their brief opposing dismissal. Doc. 48 at 18 (characterizing this case as one "in which a defendant's contacts with Illinois were as an agent of another, and unmotivated by separate personal interests of the agent"). Nor do Plaintiffs dispute that the Dontzin Defendants and VeneKlasen were acting as agents of Doig, who directed them "not to accept authentication or attribution of the disputed painting to Doig, and to take 'appropriate' steps to prevent its attribution." *Id*. at 21.

However, Plaintiffs invoke what they call the "discretion exception" to the doctrine, which they say applies where "the agent acts with discretion in his actions on behalf of the principal, unlike the police officer in *Rollins v. Ellwood*." *Id*. at 16. For support, Plaintiffs rely on *Renner v. Grand Trunk Western Railroad Co.*, 641 N.E.2d 1 (Ill App. 1994), which held that the defendant, a railroad engineer based in Michigan assigned to trains running through Illinois, was subject to personal jurisdiction in Illinois in a lawsuit alleging that he negligently operated the train and caused the plaintiff's injury. *Id*. at 1-2. *Renner* distinguished itself from *Rollins* on these grounds:

> The *Rollins* court, in holding that the Illinois courts lacked personal jurisdiction over a non-resident defendant where the nature and quality of the conduct giving rise to the lawsuit was defined solely by the defendant's status as a police officer, merely recognized the extremely limited discretion that may be exercised by a police officer in carrying out the orders of his or her superiors.

> In this case, however, there has been no showing that the nature and quality of the acts performed by the nonresident defendant were similarly compelled by his status as a railroad engineer. Petitioner failed to show that the acts giving rise to his status as a defendant in this suit were compelled by the order of his employer. Rather, this cause of action appears to arise out of alleged negligence by a nonresident occurring during normal commercial

activity in Illinois—a factual matrix which has traditionally subjected that defendant to the personal jurisdiction of the Illinois courts.

*Id*. at 3 (citations omitted).

Defendants respond that in *Femal v. Square D Co.*, 903 N.E.2d 32, 36-37 (Ill. App. 2009), a different and more recent panel of the Appellate Court of Illinois rejected *Renner*'s narrow interpretation of *Rollins*, reasoning as follows:

We disagree with the interpretation of *Rollins* presented in *Renner*. Our supreme court stated its central holding in *Rollins* concisely: Illinois courts lack personal jurisdiction over any "individual who seeks the protection and benefits of Illinois law, not to serve his personal interests, but to serve those of his employer or principal." *Rollins*, [565 N.E.2d at 1318]. The court discussed, and rejected, two suggested limitations on the fiduciary shield doctrine. The fact that the defendant committed a tort (even an intentional tort) in Illinois did not give Illinois courts jurisdiction over him. *Rollins*, [565 N.E.2d at 1318]. Also, the defendant's receipt of payment for his work in Illinois did not give him the kind of personal interest that would undo the protection of the fiduciary shield. *Rollins*, [565 N.E.2d at 1318].

The [*Rollins*] court explained: "In practical terms, an employee, especially one in Ellwood's position, has little or no alternative besides unemployment when ordered to enter another State to carry out the wishes of his employer." [*Ibid*.]. We do not construe this as a limitation on the fiduciary shield to only those cases, like Ellwood's, where a paramilitary employer compels its employee to perform certain acts in Illinois. The court set out the requisite showing in its statement of the principle. Illinois courts lack jurisdiction over an employee or agent who comes under the protection of Illinois law to serve the interests of his employer or principal, and not to serve his personal interests.

*Id*. at 37 (one citation omitted). In rejecting *Renner*'s interpretation of *Rollins*, *Femal* confirmed that the central issue under the fiduciary shield doctrine remains "whether a defendant's conduct in Illinois was a product of, and was motivated by, his employment situation and not his personal interests." *Id*. at 38 (internal quotation marks omitted).

This court finds *Femal* more persuasive than *Renner* in interpreting *Rollins* and also more consistent with the Seventh Circuit's understanding of the fiduciary shield doctrine. In *Rice v.*

*Nova Biomedical Corp.*, *supra*, the defendant (Christopher) worked in Massachusetts as Nova's director of technical services and supervised the plaintiff (Rice), a Nova employee who worked in Illinois. 38 F.3d at 910. Christopher traveled to Illinois to fire the plaintiff for poor work performance, upon which the plaintiff sued him in Illinois for defamation and retaliation. *Ibid*. Despite finding the fiduciary shield argument forfeited, the Seventh Circuit noted that "Christopher probably *was* entitled, prima facie at least, to the protection of the fiduciary-shield doctrine because, so far as the record of the trial reveals, he was not in fact in Illinois to serve his personal interests." *Id*. at 914. Significant for present purposes, the Seventh Circuit adopted the understanding of the fiduciary shield doctrine expressed years later by *Femal* and rejected the understanding expressed months earlier by *Renner* (though without mentioning *Renner*):

> So a policeman sent into a state to serve an arrest warrant cannot be sued there for false arrest, although his superiors, who sent him, can be by virtue of his having come into the state on their business. That was *Rollins*. If Christopher's action in coming into Illinois to fire and defame Rice was done solely on behalf of Nova, he is under the fiduciary shield and *this [is] regardless of whether he exercised discretion rather than merely carrying out precise orders mechanically*.

*Id*. at 912 (emphasis added).

So, even accepting Plaintiffs' submission that the Dontzin Defendants and VeneKlasen exercised discretion over precisely how they delivered messages on behalf of Doig to Bartlow Gallery and Hindman Auctioneers, that alone does not deprive the Dontzin Defendants and VeneKlasen of the fiduciary shield doctrine's protection. And as noted earlier, Plaintiffs have conceded that the Dontzin Defendants and VeneKlasen were acting not to serve their personal interests, but solely on Doig's behalf. Doc. 48 at 18, 21. It follows that the fiduciary shield doctrine protects them from suit in Illinois. *See Rice*, 38 F.3d at 112-13 ("The record contains no evidence that Christopher in firing Rice was on a frolic of his own. He may have disliked Rice

but if the policeman in *Rollins* had happened to dislike the person on whom he served the arrest warrant he would not have lost his fiduciary shield against a suit for false arrest. No 'personal interests' that might have induced Christopher to fire Rice regardless of Nova's interests, or even Christopher's conception of Nova's interests, have been identified. It is not as if Rice and Christopher had had some relationship outside their business one, or as if Christopher had been trying to harm Nova and line his own pocket, or as if the two men had been competing for the same promotion, or as if Christopher had wanted Rice's job for his nephew."); *Femal*, 903 N.E.2d at 38 ("If O'Shaughnessy actively sought to reduce Femal's income, out of animosity or embarrassment over his own mistakes, that personal interest, and his discretionary act of coming to Illinois to defame Femal in pursuit of that personal interest, may permit Illinois courts to exercise jurisdiction over O'Shaughnessy. On the other hand, if O'Shaughnessy acted solely to advance Rockwell's interests, *Rollins* instructs us that our courts lack jurisdiction over O'Shaughnessy."); *Petrich v. MCY Music World, Inc.*, 862 N.E.2d 1171, 1183 (Ill. App. 2007) (dismissing individual band members as defendants under the fiduciary shield doctrine where the "band members performed the concert [in Illinois] as ZEEKS employees and the band members were paid by ZEEKS"); *People ex rel. Hartigan v. Kennedy*, 576 N.E.2d 107, 114-15 (Ill. App. 1991) (holding that "the fiduciary shield doctrine does protect nonresident corporate representatives," not just corporate employees, and so "it is improper to hold them subject to our jurisdiction merely because they were directors of an organization that solicited charitable funds in Illinois under the direction of the president").

The claims against the Dontzin Defendants and VeneKlasen accordingly are dismissed under Rule 12(b)(2) for lack of personal jurisdiction. This disposition makes it unnecessary to reach their Rule 12(b)(6) arguments.

**Conclusion**

For the foregoing reasons, the Dontzin Defendants' and VeneKlasen's motions to dismiss are granted, and the claims against them are dismissed for lack of personal jurisdiction. *See Manez v. Bridgestone Firestone N. Am. Tire, LLC*, 533 F.3d 578, 584 (7th Cir. 2008) ("a dismissal for lack of personal … jurisdiction … foreclos[es] future litigation of the matter in the court issuing the order, [but] does not preclude a plaintiff from refiling and litigating in a proper forum"). Doig's motion to dismiss is denied, and the claims against him may proceed. Doig shall answer the complaint by October 21, 2014.

September 30, 2014

_____
United States District Judge