UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROBERT FLETCHER and BARTLOW GALLERY LTD., | ) <br> ) <br> )   13 C 3270 <br> Plaintiffs,   ) <br> )   Judge Gary Feinerman <br> vs.   ) <br> ) <br> PETER DOIG,   ) <br> ) <br> Defendant.   ) |

**MEMORANDUM OPINION AND ORDER**

Robert Fletcher and Bartlow Gallery Ltd. brought this diversity suit against Peter Doig, his art dealer, and his attorneys. Doc. 1. The suit concerns a painting ("the Work") owned by Fletcher that, according to Plaintiffs, Doig painted in the mid-1970s. Count I alleges that that Defendants committed tortious interference with prospective economic advantage by falsely telling Leslie Hindman Auctioneers that Doig did not paint the Work, with the knowledge that this would lead Hindman to decline to auction it on Plaintiffs' behalf. *Id*. at ¶¶ 54-62. Count II seeks a declaratory judgment that Doig painted the Work. *Id*. at ¶¶ 63-68.

The court dismissed Doig's art dealer and attorneys for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), but denied Doig's motion to dismiss for lack of personal jurisdiction and for *forum non conveniens*. Docs. 74-75 (reported at 125 F. Supp. 3d 697 (N.D. Ill. 2014)). After discovery concluded, the court in an oral ruling denied Doig's summary judgment motion. Doc. 198. A bench trial is set for August 8, 2016. Doc. 210. Now before the court is Doig's motion *in limine* under Federal Rule of Evidence 702 to exclude the testimony of Peter Bartlow and Victor Wiener, whom Plaintiffs offer as expert witnesses. Doc. 212. The motion is denied.

1

**Discussion**

Rule 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2316 (2016); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *United States v. Hill*, 818 F.3d 289, 296 (7th Cir. 2016). The district court serves as the "gate-keeper who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert," *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741 (7th Cir. 2007) (internal quotation marks omitted), and "has 'broad latitude' to determine how to evaluate expert testimony," *Hill*, 818 F.3d at 297 (quoting *Kumho Tire*, 526 U.S. at 153). That latitude is particularly broad in a bench trial, where "the usual concerns of [Rule 702]—keeping unreliable expert testimony from the jury—are not present." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). "The purpose of *Daubert* [*v. Merrell Dow Pharm., Inc..*, 509 U.S. 579 (1993)] was to require courts to serve as gatekeepers so that unreliable expert testimony does not carry too much weight with the jury. Judges, on the other hand, are less likely to be swayed by experts with insufficient qualifications." *United States v. Ozuna*, 561 F.3d 728, 737 (7th Cir. 2009) (citation omitted); *see also In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006) ("It is not that evidence may be less reliable during a bench trial; it is that the court's gatekeeping role is necessarily different. Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such

decisions prior to hearing the testimony is lessened."). The expert's proponent bears the burden of proving by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See United States v. Saunders*, ___ F.3d ___, 2016 WL 3213039, at *4 (7th Cir. June 10, 2016); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

**I.     Peter Bartlow**

Bartlow prepared a report under Civil Rule 26(a)(2) and was deposed. Doc. 215-2; Doc. 215-4. Bartlow has over four decades of experience in the fine arts world. Doc. 215-2 at 6-7. He earned an undergraduate degree and completed one year of graduate work in art history. *Id*. at 6. He has worked at an art gallery specializing in the "fine prints of well-known artists," including Pablo Picasso, Joan Miro, and Marc Chagall; as an art dealer responsible for sales of works by those and other major artists; and, since 1991, as the owner of his eponymous gallery, which has fostered his "[c]ontinued specialization" in major modern artists with "an emphasis on finding and promoting artists new to [the Chicago] market." *Ibid*. Over the course of his career, Bartlow has "authenticated thousands of works by hundreds of artists." Doc. 230-1 at ¶ 13.

Bartlow's report concludes that "[t]here can be no question that the Disputed Painting was painted by the hand of Peter M. Doig, based upon numerous factors," including "several idiosyncratic forms" common to the Work and Doig's acknowledged paintings, the "color and texture of the paint," and purported stylistic similarities so numerous that Bartlow opines that "[t]here are so many Peter Doig elements in this painting that it could be the most typical of all of his works." *Id*. at 25. Doig argues that Bartlow's knowledge, skill, experience, training, and education do not qualify him as an expert "with Doig's works." Doc. 215 at 12-13. Doig further contends that Bartlow's methodology is unreliable because it was invented for use in this litigation, because the purported common features he cites "are too generic to reliably establish

3

authenticity," and because he "has failed to establish that any of the purported generic features … are either unique or even common in Doig's works." *Id*. at 6-8, 14-17. These arguments fail to persuade in the context of a Rule 702 motion.

First, as to expertise, Bartlow's analysis of the Work and his authentication opinion rest primarily on his study of Doig's work and his experience as a gallerist and authenticator of modern art. Doc. 215-2 at 10, 21, 24, 26. "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (internal quotation marks omitted). Bartlow's forty years of experience with the authentication and marketing of modern art easily meet this standard.

Doig retorts that Bartlow is unqualified to authenticate the Work because he had no experience with Doig's work prior to this case and because at his deposition he was "unable to answer basic questions about Doig's *oeuvre*." Doc. 215 at 13-14; Doc. 235 at 8-9. True enough, the question the court asks under Rule 702 "is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for [him] to answer a specific question." *Gayton*, 593 F.3d at 617 (internal quotation marks omitted, alteration in original). Yet Bartlow's education and experience give him the foundation necessary to opine on the provenance of a work of modern art based on his analysis of the piece and a comparison with the artist's other acknowledged work. *See United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) ("[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.") (internal quotation marks

4

omitted). The ability to authenticate art, particularly given his experience with modern painting, is essential to Bartlow's professional activities, and he used that skill to prepare his report and reach his opinions. The distinction between Doig's work and that of other painters with whom Bartlow had more experience prior to this case bears on the weight given to his opinions, but does not render them inadmissible. *See Gayton*, 593 F.3d at 617 (noting that "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats") (collecting cases); *Diefenbach v. Sheridan Transp.*, 229 F.3d 27, 31 (1st Cir. 2000) (affirming the admission of expert testimony on the "docking and undocking" of ships even though the "case concern[ed] an accident" on a type of vessel on which the expert had not served as a crew member); *see also Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) ("[E]xpert witnesses need not have overly specialized knowledge to offer opinions.").

The decisions cited by Doig, Doc. 215 at 13, do not counsel a different result. In *Levin v. Dalva Brothers, Inc.*, the First Circuit affirmed a decision barring the testimony of a furniture appraiser as to the origins of an antique clock because the expert "had insufficient experience with Regence-era furniture to authenticate the clock." 459 F.3d at 78-79. By contrast, Bartlow has over forty years of experience with contemporary paintings. Similarly, in *United States v. Chang*, 207 F.3d 1169 (9th Cir. 2000), the Ninth Circuit affirmed a ruling that barred an expert from authenticating a financial instrument because he had expertise in the history of such instruments but no experience authenticating them. *Id.* at 1172 & n.2. By contrast, Bartlow has extensive experience authenticating contemporary art. Doc. 215-2 at 7.

Doig insinuates that because Fletcher has promised Bartlow (or his gallery, Doc. 230 at 2) a twenty-five percent share of Plaintiffs' recovery in this case, Bartlow's financial interest incented him to opine that Doig painted the Work. Doc. 215 at 6. But few experts testify out of

5

the goodness of their heart; Doig's proffered expert, Dr. Richard Shiff, presumably has been and will be compensated for his time and effort, and Doig would not have disclosed Dr. Shiff as an expert or continued to pay him if he had opined that the Work was Doig's.  This "classic evidence of bias," *Crowe v. Bolduc*, 334 F.3d 124, 132 (1st Cir. 2003), is fodder for cross-examination, not a ground for exclusion.  *See Braun v. Lorillard Inc.*, 84 F.3d 230, 238 (7th Cir. 1996) (affirming the admission of testimony from a financially interested expert because "[h]e admitted under cross-examination that part of his job … was to represent the company as a witness in lawsuits" and because "[i]n light of this admission, and of his relation to the defendant with or without the admission, the jury is likely to have discounted his testimony heavily").

Bartlow's financial arrangement with Fletcher does not run afoul of the "rule against employing expert witnesses on a contingent-fee basis."  *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1042 (7th Cir. 1988).  As an initial matter, that rule "is a rule of professional conduct rather than of admissibility of evidence," as the "trier of fact should be able to discount for so obvious a conflict of interest."  *Ibid.*; *see also United States v. Dawson*, 425 F.3d 389, 394 (7th Cir. 2005) ("Even an expert witness … may not be paid more if the party for whom he is testifying wins the case.  Yet whether violation even of that rule requires exclusion of the testimony from being used against a defendant is a separate question.") (citations omitted).  In any event, the rule does not apply to Bartlow, who is, through his gallery, a party; a party can serve as his own expert witness.  *See Tagatz*, 861 F.2d at 1042; *Hathaway v. Bazany*, 507 F.3d 312, 317 n.1 (5th Cir. 2007); *Scheidt v. Klein*, 956 F.2d 963, 968 n.4 (10th Cir. 1992).

Doig's challenge to Bartlow's methodology is unpersuasive as well.  The Seventh Circuit has cautioned that "the test for reliability for nonscientific experts is 'flexible.'"  *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999) (quoting *Kumho*, 526 U.S. at 150).  Expert testimony

6

"is not unreliable simply because it is founded on [a witness's] experience rather than on data; indeed, Rule 702 allows a witness to be 'qualified as an expert by knowledge, skill, *experience*, training, or education.'" *Metavante Corp.*, 619 F.3d at 761 (quoting Fed. R. Evid. 702); *see also Kumho*, 526 U.S. at 150 (distinguishing expert testimony based on science from "other cases," in which "the relevant reliability concerns may focus upon personal knowledge or experience," and reaffirming that the *Daubert* factors "do *not* constitute a 'definitive checklist or test'") (quoting *Daubert*, 509 U.S. at 593). Unlike scientific or technical experts, whose hypotheses can be tested or subjected to peer review and whose methods can be measured against specific standards, an art authenticator's hypotheses cannot be so mechanically scrutinized. *See Lees v. Carthage Coll.*, 714 F.3d 516, 525 (7th Cir. 2013) (holding that nonscientific expert testimony in the field of premises security did "not easily admit of rigorous testing and replication"). That alone distinguishes this case from several decisions cited by Doig, which concern technical or scientific experts. Doc. 215 at 14-16 & n.7; Doc. 235 at 8-9; *see Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 818 (7th Cir. 2014) (a gunsmith testifying about structural modifications to a gun); *Dura Automotive Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-13 (7th Cir. 2002) (a hydrogeologist); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 390, 408 (6th Cir. 2006) (a mechanical engineer); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 375 (Bankr. D. Del. 2006) (a financial analyst conducting an enterprise valuation).

As noted, Bartlow relies on his experience, his study of the Work and Doig's *oeuvre*, and his knowledge (derived in part from Doig's deposition testimony) about the methods that Doig uses to create his paintings. Doc. 215-2 at 5, 21-22, 26. Bartlow's report uses qualitative examples from eleven of Doig's acknowledged paintings to demonstrate certain similarities between them and the Work; Bartlow does not purport to have conducted a comprehensive

7

quantitative or statistical analysis, although he did testify in his deposition that he compared at least forty-five of Doig's paintings to the Work. *Id.* at 24; Doc. 215-4 at 48-49. Bartlow analyzed the condition of those paintings, the type of paint used, what he believes to be the "unique attributes" of Doig's works, the purported similarities between shapes and their positioning in the Work and Doig's authenticated paintings, and "repeated lineatures" common to Doig's work. Doc. 215-2 at 5, 11, 16-17, 21. This analysis is consistent with the qualitative nature of Bartlow's opinion and his area of expertise more generally.

Doig protests that Bartlow improperly invented a methodology for use in this case: superimposing lines from Doig's authenticated paintings onto the Work in an attempt to demonstrate similarities. Doc. 215 at 14; Doc. 215-4 at 90-91. That point goes to weight, not admissibility. Bartlow plausibly asserts that the challenged methodology "is simply a refinement of methods used by any art connoisseur, appraiser, or authenticator." Doc. 230-1 at ¶ 1. Moreover, as Bartlow testified, that the methodology pertains only to a limited aspect of his overall analysis—"the superimposition of the Grand Rivera [another Doig painting] image kind of upside-down over the Disputed Work," Doc. 215-4 at 90—and not to his analysis of the Work's condition, of the type of paint used, or of the qualitative consideration of purported similarities in shapes and composition between the Work and Doig's acknowledged paintings.

Likewise, Doig contends that the common features that Bartlow identified between the Work and Doig's other paintings are too generic to establish authenticity, are not unique to or common in Doig's work, and in at least some instances contradict Bartlow's conclusion that Doig painted the Work. *Id.* at 7-8, 15-16. Those contentions, however, merely challenge the persuasiveness of Bartlow's expert testimony, not its admissibility. At the Rule 702 stage, where the court acts only as a gatekeeper, "[i]t is not the … judge's job to determine whether the

8

expert's opinion is correct." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 410 (7th Cir. 2014); *see also Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (noting that when "the judge [is] in the role of gatekeeper for expert testimony, the key to the gate is not the ultimate correctness of the expert's conclusions"). To the contrary, "[i]n a bench trial," only "once the court has fulfilled its gatekeeping function" does "it become[] a trier of fact that needs to assess the evidence itself—not just the methodology underlying that evidence." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015). The fact that the court admits Bartlow's testimony under Rule 702 now does not speak one way or the other as to whether the court will agree with Bartlow's opinion at trial. *See ibid.* ("When expert testimony has been admitted under *Daubert*, the soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

Accordingly, Doig's motion to exclude Bartlow's expert testimony is denied.

## II. Victor Wiener

Wiener is a trained art historian and appraiser who has published extensively, including as co-editor and principal contributor to *All About Appraising: The Definitive Appraisal Handbook* (2003), and co-author of *An Underwriter's Guide to the Valuation of Art, Antiques & Collectibles* (2001). Doc. 215-3 at 9. Wiener has worked for several auction houses in Rome, London, and New York, including at Christie's and Sotheby's. *Ibid.* Wiener served for twenty-one years as executive director of the Appraisers Association of America, and has taught the appraisal of fine and decorative arts at the New School, Baruch College, and, for over twenty years, New York University, where he teaches courses on appraisers' legal and ethical responsibilities and the Uniform Standards of Professional Appraisal Practice ("USPAP"). *Ibid.*

9

He has served as an expert witness in several cases, including the valuation of the Detroit Institute of Arts during the 2014 Detroit bankruptcy trial and matters concerning the estates of and/or works by Andy Warhol, Louise Nevelson, Pablo Picasso (including *Le Rêve*), and Damien Hirst. *Id*. at 9-10. Several Canadian government agencies have employed Wiener as an appraiser in a variety of fine arts and cultural matters. *Id*. at 9. Wiener is currently an appraiser in private practice; three of his colleagues, all with extensive backgrounds in art history, appraisal, or valuation, assisted Wiener in this case. *Id*. at 9-11.

Wiener prepared a report under Civil Rule 26(a)(2) and was deposed. Doc. 215-3 at 9-11; Doc. 215-5. The report states that it was "prepared in accordance with" USPAP, which "comprises standards promulgated by the Appraisal Foundation … as the major codification of appraisal standards for all appraisal disciplines." Doc. 215-3 at 12, 62. The report attempts to determine the fair market value of—*not* to authenticate—the Work on the assumption that Doig actually painted it. *Id*. at 14-15 ("[A]n extraordinary assumption has been taken that the [Work] is to be regarded as authentic when appropriate within the context of this Report, in the marketplace[s] determined as appropriate for this Report. Following from this, a limiting condition is that this Report is not to be considered to be an opinion of authenticity or a warranty of the [Work].") (second alteration in original). After surveying the "historical importance of the" Work, the state of the contemporary art market in general and the Doig market in particular, the report concludes that the Work's current value, "with doubts about authenticity," is $50,000, but that the Work's value if accepted as authentic would be $6 million to $8 million. *Id*. at 61.

Doig does not challenge Wiener's qualifications as an expert, but rather contends that his opinions are irrelevant and his methodology unreliable. Doc. 215 at 17-30; Doc. 235 at 11-18. Those arguments fail in the context of a Rule 702 motion.

First, Doig argues that because Wiener does not purport to authenticate the Work, he has no opinion on what Doig characterizes as the only relevant issue in the case: whether Doig painted the Work. Doc. 215 at 17-18. But Wiener's opinion is relevant to the tortious interference claim. "To state a claim under Illinois law for intentional interference with prospective economic advantage, a plaintiff must allege (1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Foster v. Principal Life Ins. Co.*, 806 F.3d 967, 971 (7th Cir. 2015). If the court determines that Doig painted the Work and tortiously interfered with the Hindman auction, Wiener's appraisal will be relevant to damages.

Second, Doig contends that Wiener's appraisal is unreliable because he did not use "any survey or other reliable means to assess public opinion." Doc. 215 at 17-18; Doc. 235 at 11-12. In some cases, such as those involving brand trademarks or widely marketed goods, experts may need to conduct market research surveys to offer a reliable opinion. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 195 (1st Cir. 2012) (noting, in a trademark infringement case involving guitars, that "without" market research surveys, the expert's "report was merely a basis for jury speculation and his testimony was properly excluded"); *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, 2011 WL 167259, at *5 (D. Minn. Jan. 14, 2011) (excluding, in a Lanham Act case involving advertising for consumer goods, the testimony of an expert who "did not send out surveys, conduct interviews, or rely on anything to formulate her opinion besides her experience in the industry").

11

This case is different. As a University of Chicago economist observed, "the art market is different to most: you don't buy a Luc Tuymans painting at Macys." Canice Prendergast, The Market for Contemporary Art 1 (2014) (unpublished manuscript), https://perma.cc/HW4G-SUQX. Art "prices do not always answer to the same rules as elsewhere"; instead, collectors and "galleries often have objectives other than current profit maximization," and "the market for many successful artists is very thin, with few serious buyers." *Id*. at 2. Moreover, "art prices are inherently subjective because they are not correlated with artworks' intrinsic value"; "the art market is relatively unregulated"; "the only sale prices made public are those from auction records," which constitute a relatively small portion of total sales; "dealers or collectors [may] manipulate prices without being identified," and "segments of the art market are small and tight-knight, often guarding prices from the greater public." Nicole Dornbusch Horowitz, Note, "Price Fixing the Priceless? Discouraging Collusion in the Secondary Art Market," 66 *Hastings L.J.* 331, 334 (2014); *see also* Mark A. Reutter, "Artists, Galleries and the Market: Historical, Economic and Legal Aspects of Artist-Dealer Relationships," 8 *Vill. Sports & Ent. L.J.* 99, 113 (2001) ("The formation of prices in the art market follows its own and specific rules. These rules are different from general economic approaches and can hardly be compared to the rules prevailing in other markets."); Adriano Picinati di Torcello, "Why Should Art Be Considered as an Asset Class?" at 14, *Deloitte* (2010), https://perma.cc/5R9E-H42G (noting that the "main characteristics usually used to define art markets" include "high-risk investment, illiquid, opaque, unregulated, high transactions costs, at the mercy of erratic public taste and short-lived trends"). And private art sales, which by their very nature are largely impervious to market surveys, account for more than half of the total value generated in the art market. *See* Horowitz, *supra*, at 334, 339-340; Alexander Forbes, "The 10 Most Important Takeaways from the 2016

TEFAF Art Market Report," *Artsy* (Mar. 11, 2016), https://perma.cc/7ZYP-LP74; David Segal, "Swiss Freeports Are Home for a Growing Treasury of Art," *N.Y. Times* (July 21, 2012), https://perma.cc/MNR9-9S9J. Given these relatively unique features of the high-end art market, even auction houses often have considerable uncertainty about the value of, potential buyers for, and probable prices of the art works they auction. *See* Rebecca Mead, "Swimming with Sharks," *The New Yorker* (July 4, 2016), https://perma.cc/M2M6-S2E7 ("Promising a minimum price at auction can coax an [art] owner into selling, but it leaves the auction house vulnerable. If the house guarantees a work and it fails to sell, the house is obliged to buy it, and then attempt to sell it privately. Meanwhile, if a third party guarantees a work and it sells to a different bidder, the guarantor may get a share of the upside.").

As an experienced and qualified appraiser, Wiener is intimately familiar with the art market's dynamics; indeed, appraisal is in large part recognizing how those dynamics will influence the price of a particular work. Wiener's professional activities depend on his ability to gauge the art market's likely response to a work, and he used that skill to form his opinion. And contrary to Doig's submission, Wiener did not actively ignore others' opinions: he attempted to speak with three scholars of Doig's work, only one of whom responded (by declining to comment). Doc. 215-3 at 19. Doig contends that Wiener's resulting failure to speak with Doig scholars means that Wiener has no reliable methodology to opine that "collectors of Doig's work would consider the [Work] to be genuine," Doc. 215 at 9, but Wiener explains plausibly that "scholars frequently decline to comment on matters of authenticity for fear of being subject to litigation or having other potentially damaging consequences to their scholarly reputations." *Ibid*. Wiener's inability to speak with Doig scholars influences the weight, not the admissibility, of his opinions.

13

It again bears mention that Wiener offers an appraisal of the Work *on the assumption* that it is an authentic Doig; Wiener himself is not offering an authentication opinion. In *Levin*, which addressed circumstances very similar to those presented here, the First Circuit affirmed the admission of Wiener's expert testimony that a "clock was unusual because of its painted panels, and that substantial renovations to the clock would not alter its period of origin." 459 F.3d at 79. In so doing, the court rejected the contention that Wiener "was not qualified to offer these opinions because he did not authenticate the clock as originating in [the] Regence period," reasoning that Wiener's "testimony was not intended to authenticate the clock; it was based on the assumption that the clock was authentic." *Ibid*. The same rationale applies here.

Doig nevertheless objects that Wiener's appraisal opinions necessarily depend on how the market would receive the painting, which in turn depends in part on some of the elements—including the circumstances of the Work's creation and the purported "stylistic similarities" between the Work and Doig's acknowledged paintings—that inform Bartlow's authenticity opinions. Doc. 215 at 28-30 & n.19; Doc. 235 at 16-18. But the court will not consider Wiener's analysis of these elements in determining authenticity, and if Plaintiffs or Wiener try to offer them as such, the court will not permit it. In other words, although Doig is right that the court "should not rely on Wiener's opinions … in making a determination as to whether Doig authored the Disputed Work," Doc. 235 at 18, that does not require the exclusion of Wiener's appraisal testimony under Rule 702.

Third, Doig argues that Wiener's methodology was invented for this case and is, by Wiener's admission at his deposition, not described in USPAP. Doc. 215 at 19; Doc. 235 at 12-13. True, "an expert must do more than just state that [he] is applying a respected methodology; [he] must follow through with it." *Brown v. BNSF Ry. Co.*, 765 F.3d 765, 773 (7th Cir. 2014).

14

But Doig mischaracterizes Wiener's deposition testimony. Wiener describes the USPAP appraisal standards as "general rules of conduct … [and] standard rules concerning competency and concerning general scope of work," and adds that in those "standards and rules, [Doig's] concerns are addressed in one form or another." Doc. 215-5 at 201. The standards in question, USPAP Standards 7 and 8, *ibid*., are indeed quite general, providing, for example, that an appraiser must "be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal," "not render appraisal services in a careless or negligent manner," and "communicate each analysis, opinion, and conclusion in a manner that is not misleading." Appraisal Foundation, *Uniform Standards of Appraisal Practice* 50, 55 (2016-17 ed.), https://perma.cc/H35K-T2NU. Even putting aside the fact that an appraiser is not a scientific or technical expert and therefore that appraisal testimony is not subject to mechanical scrutiny against scientific standards, *see Lees*, 714 F.3d at 525, Standards 7 and 8 are general guidelines, Wiener plausibly maintains that his opinion is consistent with them, and Doig does not identify with any specificity a contradiction between accepted USPAP methods and those that Wiener employed. Further, USPAP Standard 7 *does* expressly provide for appraisal based on comparable sales, which constitute a significant portion of Wiener's report. Doc. 215-3 at 51-60; *see* Appraisal Foundation, *supra*, at 53 ("When a sales comparison approach is necessary for credible [appraisal] assignment results, an appraiser must analyze such comparable sales data as are available to indicate a value conclusion.").

Fourth, Doig contends that Wiener did not consider all relevant information about the Work, but instead relied solely on Plaintiffs for such information. Doc. 215 at 20-21; Doc. 215-5 at 199; Doc. 235 at 16-17. As with Wiener's lack of survey evidence, this alleged shortcoming is not the kind that renders his opinion inadmissible. His failure to consider facts to which he was

15

not privy, or even his lack of awareness of those facts, may ultimately reduce the weight given to his opinions, but his appraisal methodology is not unreliable simply because he did not have all of the information potentially relevant to the case. "After all, even experts make mistakes, and imperfections in their presentations are supposed to be tested by opposing counsel and put before the" trier of fact. *Brown*, 765 F.3d at 773. And because the court will not consider Wiener's opinion for anything other than valuation on the assumption that the Work is authentic and would be understood as such by the relevant market, that Wiener may be unaware of some facts relevant to authenticity is irrelevant on a Rule 702 motion.

Fifth, Doig argues that Wiener's opinion must be excluded because it relies in part on the opinions of Warren Spencer, a graphologist whom Plaintiffs retained to examine the signature on the Work. Doc. 215 at 22-28; Doc. 235 at 13-16. Doig contends that Plaintiffs did not disclose Spencer prior to the December 7, 2015 expert disclosure deadline, Doc. 116; that Spencer did not produce his report until March 8, 2016, three months after Wiener issued his report; and that Wiener was not given Spencer's report until a day before his April 22, 2016 deposition, when Doig first received the report. Doc. 215 at 22-24. Doig argues that Wiener's reliance on Spencer requires excluding Wiener's testimony because an expert "is not permitted to be the mouthpiece" of an undisclosed expert in a different field. *Dura Automotive Sys.*, 285 F.3d at 614.

This argument is unpersuasive. To the extent that Wiener considered Spencer at all, it was not Spencer's *report*—which Wiener's report acknowledged was "forthcoming"—but instead his knowledge of Spencer's ultimate *conclusion*. Doc. 215-3 at 21 ("It is our understanding that Bartlow Gallery Ltd. has commissioned a graphologist …. It is also our understanding that the graphologist has already voiced the opinion that both signatures are by the same person."). But even that is a moot point, because Wiener does not *rely* on Spencer's

16

conclusion as part of his appraisal methodology; Wiener merely cites it, commenting that "[s]hould the forthcoming graphologist's report correspond to our understanding [that the signature is Doig's], we believe that these facts *will further confirm* the opinion of collectors of Doig that the Subject Property is authentic." *Ibid*. (emphasis added). Put another way, Wiener's understanding that Spencer authenticated the signature is merely an aspect of his overarching assumption that the Work is authentic and would be perceived as such in the relevant community. And because Wiener does not himself purport to authenticate the Work but instead assumes its authenticity for the purposes of his appraisal, his opinion does not improperly rest on the signature's authentication by Spencer.

That distinguishes this case from *Dura Automotive Systems*. The plaintiff, Dura, offered Valkenburg, a hydrogeologist, as an expert to testify that CTS's plastics plant was within the "capture zone" or "catchment basin" of a polluted well field. 285 F.3d at 611-12. In rendering that opinion, Valkenburg deployed mathematical models of groundwater flow prepared by others; those models were themselves subject to challenge—the "parties agree[d] that without such a model Dura could not prove its case against CTS," *id*. at 611—and Valkenburg admitted that he was not qualified to discuss them. *Id*. at 611-12. While acknowledging that "it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert," the Seventh Circuit affirmed Valkenburg's exclusion. *Id*. at 613. Because Valkenburg's assessment of the capture zone required accurate groundwater models, the court reasoned, Valkenburg's testimony regarding the capture zone "raised questions that only an" expert in groundwater modeling "could answer"—and since "Valkenburg was not competent to opine on [that] issue … Dura could not get to the [capture zone issue] and so could not prevail." *Id*. at 614-15; *see also In re*

17

*James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992) ("The architect could use what the engineer told him to offer an opinion within the architect's domain of expertise, but he could not testify for the purpose of vouching for the truth of what the engineer had told him.").

That is not the case here. Wiener does not vouch for the truth of Spencer's opinion regarding the signature on the Work, give his imprimatur to Spencer's opinion, improperly allow Spencer to "hide behind" him, or use Spencer's methodology as part of his own appraisal opinion. *Dura Automotive Sys.*, 285 F.3d at 614. Although Wiener acknowledges that the signature's authentication is "paramountly important," "an important factor for the valuation," and "essential," Doc. 215-5 at 231, 272, 277, his opinions do not analytically depend on or independently assert the signature's authenticity. As noted, Wiener provides two valuations, one of which (the valuation "[a]t present," Doc. 215-3 at 61) assumes that potential buyers would doubt the Work's authenticity—a scenario that hardly makes sense if Wiener were relying on the notion that the signature were authentic. Conversely, if the Work were authentic and considered so by the relevant market—as Wiener's second valuation assumes but does not purport independently to establish—the signature would be as well; if the painting is Doig's, so is the signature. Wiener's appraisal opinion, in fact, is similar to a hypothetical opinion that *Dura Automotive Systems* noted would pass muster: "Valkenburg could have testified that the well field was contaminated by volatile organic compounds and that if CTS's plastic plant was within the well field's capture zone some of the contamination may have come from that plant." 285 F.3d at 613. By the same token, Wiener can testify that if the signature were authenticated, by Spencer or anyone else, the market would be more inclined to regard the Work as authentic, and that under those circumstances, the market would value the Work at $6-8 million. *See Levin*, 459 F.3d at 79.

18

Doig also contends that Spencer's report should be stricken because its introduction would unfairly prejudice Doig. Doc. 215 at 26-28; Doc. 235 at 15-16 & n.11. As Plaintiffs note, however, Spencer's report has not been offered into evidence, and Plaintiffs do not intend to call Spencer as a witness. Doc. 230 at 14-15; Doc. 244 at 3. As a result, and because Wiener merely assumes the signature's authenticity, Doig's contention that "it is abundantly clear that Spencer's opinions are wildly unreliable" and that the court should permit Doig to depose Spencer and obtain all materials on which he relied, Doc. 215 at 27; Doc. 235 at 14-15 & 16 n.11, is in part irrelevant (as to the reliability of Spencer's opinion) and in part wrong (as to the proposed deposition). *See* Fed. R. Civ. P. 26(b)(4)(D) ("Ordinarily a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness as trial."). Once again, Wiener's second valuation assumes, but does not independently verify, that Doig painted the Work, that the signature is Doig's, and that the market would accept those propositions.

Now that the contours of Wiener's opinion have been clarified by the briefs filed in conjunction with this motion, Doc. 230 at 11 (Plaintiffs acknowledging that Wiener will not offer opinions on the Work's authenticity), the court will not consider anything Wiener says for the purpose of determining whether Doig in fact painted the Work. Of Plaintiffs' two experts, the court will consider only Bartlow's opinions on that question. As to whether Wiener's appraisal opinions would survive Rule 702 in the context of a jury trial, where the court could not be as confident that the trier of fact could appropriately parse and understand the proper scope of those opinions, the court need not decide. See *Metavante Corp.*, 619 F.3d at 760; *Ozuna*, 561 F.3d at 737; *In re Salem*, 465 F.3d at 777.

19

**Conclusion**

For the foregoing reasons, Doig's motion to exclude the expert testimony of Bartlow and Wiener is denied.

July 21, 2016

United States District Judge