UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT FLETCHER and BARTLOW GALLERY LTD., | ) ) | |
| | ) | 13 C 3270 |
| Plaintiffs, | ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) | |
| | ) | |
| PETER DOIG, GORDON VeneKLASEN, MATTHEW S. DONTZIN, and THE DONTZIN LAW FIRM LLP, | ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WILLIAM FREDERICK ZIESKE, | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION AND ORDER**

Robert Fletcher and Bartlow Gallery Ltd. brought this diversity suit against Peter Doig

and some of his associates, alleging interference with prospective economic advantage and

requesting damages and declaratory relief. Doc. 1. Plaintiffs alleged that Defendants falsely

denied that Doig, an internationally renowned artist, had created a painting owned by Fletcher

and thereby frustrated Plaintiffs' ability to sell the work. After the court dismissed the claims

against Doig's associates, Docs. 74-75 (reported at 125 F. Supp. 3d 697 (N.D. Ill. 2014)), and

denied Doig's summary judgment motion, Doc. 198, the case proceeded to a bench trial. The

court rendered a verdict for Doig, finding that he had not authored the painting. Docs. 260-261.

Before the court is Defendants' motion for sanctions under Civil Rule 11, 28 U.S.C. § 1927, and

the court's inherent authority against Plaintiffs and their (now former) counsel, William Zieske.

Doc. 273. With sincere apologies for the substantial delay in resolving this difficult and

unfortunate coda to the litigation—placing at risk Zieske's professional reputation and involving large sums of money for both Zieske and Plaintiffs—Defendants' motion is granted in part and denied in part.

**Background**

To support their sanctions motion, Defendants submitted an appendix comprising over 4,000 pages of materials. Much of this material is located elsewhere in the record or was admitted at trial; to the extent it is not, neither Plaintiffs nor Zieske object to its consideration for the purposes of this motion.

### A. The Painting

From 1975 to 1978, Fletcher attended Lakehead University in Thunder Bay, Ontario. Doc. 273-5 at p. 86, ¶ 9. At the same time, Fletcher worked as a correctional officer at the Thunder Bay Correctional Center ("TBCC"). Doc. 273-8 at 139 (138:2-24). In 1976, a prisoner incarcerated at TBCC created the painting at issue in this case. Doc. 273-5 at p. 86, ¶¶ 4, 11. Over a period of months, Fletcher observed the painting progress from its initial stages to completion. *Id*. at p. 86, ¶ 11. After the painter's release from TBCC, Fletcher assisted him in gaining employment through the Seafarers Union. *Id*. at p. 86, ¶ 10. Fletcher later purchased the painting from its creator for $100. Doc. 273-8 at 292-295 (291:20-294:3).

Fast forward to 2011, when a friend visiting Fletcher's home noticed the painting and told him that it had been created by a renowned artist named Peter Doig, *id*. at 305 (304:7-23)—perhaps after noticing that the work was signed with a very similar name, "Pete Doige," Doc. 273-3 at p. 3, ¶ 8. Fletcher contacted Peter Bartlow, the owner of Bartlow Gallery Ltd. in Chicago, in hopes that the gallery could sell the painting on his behalf. Doc. 273-8 at 312-316

(311:10-315:17). In September 2011, Fletcher and Bartlow Gallery entered into an agreement to split the proceeds of any sale. Doc. 273-11 at 49-50.

Around the same time, Fletcher contacted Sotheby's for an auction estimate and received the following response:

> Thank you very much for sending in your auction estimate form and accompanying image of your wonderful early painting by Peter Doig. It is rare to see such a complete and highly resolved early painting by Doig, with clear allusions to his mature style. Your work has the trademark eeriness of the empty landscape, and a stratified composition which recalls his later work.
>
> It would be wonderful … to get more information f[ro]m you regarding the piece. We would love to know its date of execution, if it is signed or dated or titled anywhere, and also the size of the work (height by width). We would also be very interested to know the history behind the work—how you came to own it, and if you bought it from a gallery or from the artist directly, or through some other route? Once we have this extra information we will be delighted to give you an auction estimate … .

Doc. 273-12 at 24-25. The email added this disclaimer: "The above estimates are preliminary only and subject to change based on first-hand inspection and further research. We have provided these estimates based on our assumption that the property can be offered freely and openly in the international market." *Id*. at 25.

Given that Doig is a renowned artist, a work authenticated as his would sell for significantly more than one lacking such authentication. Quite sensibly, Bartlow wanted to authenticate the work before selling it. In September 2011, he attempted to contact Doig by email, stating: "We would like to contact [Doig] regarding the authentication of one of his early paintings done in Thunder Bay while in school. It was sold to a classmate who still has it, Bob Fletcher." Doc. 273-18 at 29-30. One of Doig's associates responded: "Mr. Doig never lived/attended school in Thunder Bay, Ontario. Additionally he does not believe he knows or did know a Mr. Bob Fletcher." *Id*. at 29.

In October 2011, Bartlow emailed Gordon VeneKlasen, an employee at the Michael Werner gallery, which represents Doig:

> Robert Fletcher alleges to have purchased this painting from the same Peter Doig who he can see in interviews on You Tube. …
>
> He was not merely a classmate of Mr. Doig's, and he says he helped the artist gain membership to the seafarer's union. …
>
> …
>
> I have searched, and I can't find anything that accounts for Peter Doig's life from 1976-1978.  Mr. Fletcher is only interested in receiving a fair price for the painting, and does not wish to bring up anything which Mr. Doig would wish to remain private. …
>
> …
>
> If we are wrong, we apologize, but we would need a little convincing before following every possible lead to find the truth. …
>
> …
>
> Please ask the artist to agree to admit he painted it and the circumstances shall remain forgotten.

Doc. 273-15 at 7.  VeneKlasen responded: "Whatever this person alleges is untrue" and "The painting is NOT by Peter Doig.  Anyone can see that."  *Id*. at 6.  VeneKlasen continued: "We are not interested in any further communication related to this.  Good luck in finding the real artist for this."  *Ibid*.  VeneKlasen concluded: "Any attempt to attribute this painting to Peter Doig in any way will be dealt with by our attorneys."  *Ibid*.

The same day, Bartlow responded to VeneKlasen, writing:

> According to interviews, [Doig] dropped out of school for a time to 'work.' …
>
> …
>
> According to a biographer, he fabricated elaborate school records when applying to art school.
>
> …

4

> We are curious as to why we cannot find any reference to anywhere Peter Doig was in 1976 other than tales of oil rigs and roustabouts.
>
> Then there is the curious lack of any reference to his life before 1979. No mention of siblings, no names of parents.
>
> Unfortunately, my client has not said anything that can be debunked by anyone other than the artist, and he has admitted to lying about his past.
>
> If we have the wrong man, we are sorry, but we are going to have to get more pro[o]f to just forget about this.
>
> You should have Peter talk to his attorneys and tell them if there is anything he needs to tell them. If we can get proof of his name and life during those years we will stop.

*Id*. at 5-6. VeneKlasen wrote back to again dismiss the possibility that Doig had painted the work, *id*. at 5, to which Bartlow responded with the suggestion that Doig had falsified records and was attempting to cover something up about his past, *id*. at 2-3. Bartlow also suggested that Doig's ability to enter the United States might be compromised if it was determined that he had falsified his records. *Id*. at 3. The same day, Bartlow emailed Fletcher, stating: "The dealer denied it again, so I may have to turn up the heat a notch." Doc. 273-16 at 36.

Bartlow's attempts to authenticate the painting continued through 2012, when he contacted Doig's father several times. *Id*. at 38-43. Bartlow's statements to Doig's father included: "[Doig] could have put an end to this a year ago [b]y providing some proof. We will not stop until he comes forward one way or the other"; "What I can't figure out is if you are protecting him, or if he is protecting you. We can still work this out like gentlemen."; and "You cannot hide forever, and I am not the least intimidated by attorneys or auction houses. … This is not anything close to extortion, by the way. … If [Doig] is lying, I guess that is not illegal unless this ends up in court. It could end up in court. … I do not want to go that route. … Why don't we work something out that will put an end to this? We are not unreasonable." *Id*. at 40-43.

### B.    Procedural Background

Plaintiffs filed this suit in April 2013, naming as defendants Doig, VeneKlasen, Matthew

Dontzin (Doig's attorney), and Dontzin Law Firm LLP (Dontzin's law firm).  Doc. 1.  The

complaint alleged (incorrectly as to Doig) as follows.  Doig and Fletcher met in 1975 or 1976,

while both were enrolled at Lakehead University.  *Id*. at ¶ 21.  Shortly after enrolling at

Lakehead, Doig was convicted for LSD possession and incarcerated at TBCC, where Fletcher

was a correctional officer.  *Id*. at ¶¶ 22-23.  During his time at TBCC, Doig participated in the

prison's fine arts educational program.  *Id*. at ¶ 23.  Doig authored the painting at issue while at

TBCC, and Fletcher viewed the painting at several stages of its creation.  *Id*. at ¶ 24.  After Doig

was granted parole, Fletcher helped him find employment through the Seafarers Union in

Thunder Bay.  *Id*. at ¶¶ 25-27.  Fletcher purchased the painting from Doig for $100.  *Id*. at ¶ 28.

The complaint further alleged the following.  Doig was in his late teens in 1976; he had

publicly admitted to using LSD; several of his paintings' titles referenced LSD; Doig could not

account for his whereabouts or activities between 1976 and 1979; and the painting "has uncanny

commonalities in composition and execution with known works by Doig."  *Id*. at ¶¶ 32(a),

(c)-(e).  The complaint also alleged: "Despite extensive research, no evidence has been found of

any other person with a first name of Pete or Peter and a family name of Doig or Doige in

Canada in the late 1970s."  *Id*. at ¶ 32(f).

In June 2013, Dontzin and the Dontzin Law Firm served Plaintiffs and Zieske with

Rule 11(c)(2) correspondence, demanding withdrawal of the complaint.  Doc. 273-3 at 18.

Attached to the motion were several pieces of evidence that Dontzin and his law firm claimed

rendered frivolous the complaint's allegations, including: a communication from Lakehead

University saying that no one by the name Peter Doig, with Doig's birthdate, had ever been

enrolled at Lakehead; a search conducted by the Royal Canadian Mounted Police that did not identify anyone by the name Peter Marryat Doig (his full name) with Doig's birthdate as having a criminal record; secondary school records of Doig's suggesting that he was not incarcerated in 1975 or 1976; various correspondence between Doig and his family indicating that Doig had not been incarcerated during that time; and internet searches for "Peter Doige" showing others with that name who lived or had lived in Canada. *Id*. at 61-110.

Plaintiffs did not withdraw their complaint. Defendants continued their own investigation, finding a woman named Marilyn Doige Bovard, the sister of one Peter Edward Doige. Doc. 273-4 at 3. In August 2013, Bovard signed a declaration averring that she was Doige's sister; that Doige attended Lakehead University in the 1970s; that he had been convicted of a crime in Sudbury, Ontario, and subsequently incarcerated at TBCC; and that he had died in 2012. *Id*. at p. 6, ¶¶ 2-4, 6. Bovard further averred that Doige had told her that he took painting and music classes while incarcerated at TBCC, *id*. at p. 6, ¶ 5, and she attested that Doige had created various artworks, including a painting of a desert scene (though not the one that Fletcher possessed), *id*. at p. 7, ¶ 9. Having been shown a copy of the painting that Fletcher possessed, Bovard asserted that the desert scene it depicted resembled an area in Arizona where her and Doige's mother had lived after divorcing their father. *Id*. at p. 8, ¶ 12. Bovard attached to her declaration a copy of Doige's Lakehead student ID card (bearing his name, photograph, and signature), his carpenter union membership card, his driver's license, and a statement of his death from a funeral home director. *Id*. at 10-13.

Plaintiffs did not withdraw their suit in response to Bovard's declaration. At a September 2013 status hearing, Plaintiffs, through Zieske, took issue with the fact that Bovard had not submitted an "official death certificate" (instead just a mortician's statement of death) and

suggested that that supposed evidentiary shortfall was just the "tip of the iceberg" as to other discrepancies raised by her declaration. Doc. 273-6 at 4-5 (3:24-4:14). The court asked Zieske whether—given the Rule 11 correspondence—"it would be in your interests to put the brakes on this case" to determine whether the painting had been authored by Doige rather than Doig. *Id*. at 6. Zieske responded that "there are other people related to [Doige] who say that it's impossible for him to have been in Thunder Bay" at the time the painting was created, though he claimed that he did not want to disclose the entirety of his investigation. *Id*. at 6-7 (5:24-6:1). Before the hearing ended, the court cautioned Zieske to "bear in mind, if the … defendants turn out to be right, just because you had an objectively reasonable basis, assuming you did, at the beginning of the case, you can lose an objectively reasonable basis in the middle of the litigation. And it's at least conceivable that this is that time." *Id*. at 10 (9:16-21).

On February 17, 2014, Zieske submitted an affidavit claiming that he had spoken with Doige's mother and that she had told him that Doige had perhaps been incarcerated in Florida, but not Canada, and that Doige had not spent time in Ontario or Thunder Bay. Doc. 48-3 at ¶ 13. (Defendants' counsel would tell the court that Bovard told them that her mother was ill and had been confused by Zieske's call. Doc. 273-6 at 30-31 (17:25-18:5).) Still, Plaintiffs never submitted evidence from Doige's mother—in the form of a deposition or affidavit or otherwise—supporting Zieske's claims about what she supposedly had told him. Indeed, at a May 7, 2014, hearing—where the court discussed the logistics of obtaining Doige's records from Canadian governmental agencies with the assistance of Doige's family—Zieske explained that Doige's mother would not cooperate as a witness, while Doige's sister was a witness for Defendants. *Id*. at 26-27 (13:11-14:20).

In May 2015, Zieske obtained from the Seafarers Union a record of membership for Doige. Doc. 273-11 at 45-47. Zieske also asked Lakehead University for "any records that may be in your possession relating to either Peter Doige or Peter Doig, including but not limited to: any applications, enrollment records, tuition payment and financial aid applications and records, and course and grade reports in the 1970s." *Id*. at 40. Lakehead responded in June 2015, stating that it had records and a transcript for Peter Edward Doige—whose Canadian Social Insurance Number on those records matched that of the member of the Seafarers Union whose records Zieske had obtained—indicating that Doige had attended Lakehead from 1976 to 1978. *Ibid*. Lakehead also stated that it had no records indicating that a Peter Marryat Doig had ever attended. *Id*. at 41.

In October 2015, Doig disclosed under Civil Rule 26(a)(1) the names of over twenty individuals whom he claimed had knowledge of his whereabouts during the relevant timeframe, including eleven for whom contact information was provided. Doc. 273-5 at 9-13. At trial, Bartlow admitted that he never attempted to contact those individuals. Doc. 273-8 at 736-737 (735:2-737:18). Doing so would have served no purpose, according to Bartlow, because, in his view, those individuals would have refused to say anything to hurt Doig. *Id*. at 736-737 (735:11-736:18).

In November 2015, Doig deposed Bartlow and Fletcher. At both depositions, Bartlow and Fletcher were questioned about Bovard's declaration and asked whether they had a factual basis to dispute her assertion that Doige had attended Lakehead and served time at TBCC. Doc. 273-6 at 324 (69:13-16), 528-533 (100:10-105:8). Bartlow was unable to muster any basis to dispute Bovard's statements. *Id*. at 324 (69:13-16). Nor was Fletcher for the most part, except that he questioned whether Doige could have attended Lakehead based on documents he

had obtained from a Thunder Bay courthouse, which he interpreted to arguably suggest that Doige would have spent too much time in prison to attend Lakehead. *Id*. at 533-36 (105:13-108:16). He conceded, however, that his interpretation rested on uncertain assumptions about the documents. *Id*. at 536 (108:6-15).

In December 2015, Doig obtained declarations from Ernest Adams and Matthew Esquega. Doc. 273-5 at 200-203. Esquega averred that he had been an inmate at TBCC in the late 1970s, that he had reviewed the image of Doige from his Lakehead University ID card, and that he recognized him as a TBCC inmate whose name was Peter Doige and who was a good painter. *Id*. at 200. Adams averred that he was the art teacher at TBCC from 1975-1977, that he had reviewed the same photo of Doige, that the individual pictured was a former student in the TBCC art class during the late 1970s, and that his name was Peter Doige. *Id*. at 203. Adams also said that he had reviewed an image of the painting, and that he recalled Doige creating it at TBCC. *Ibid*.

In July 2016, Zieske deposed LeeAnn Sharpe, Doige's ex-wife. Doc. 273-7 at 445-446 (24:17-25:8). Sharpe testified that Doige had gone to school "for art," at "Lakehead, I think it was called?" *Id*. at 478 (57:17-22). She further testified that Doige had told her that he had been in trouble with the law, in Sudbury, Ontario, and that he had gone to jail in Thunder Bay. *Id*. at 589 (168:3-13). She also testified that Doige told her that he would "draw, paint, play music" while incarcerated. *Id*. at 604 (183:10-17).

In December 2015, Doig moved for summary judgment. Doc. 160. (By this point, the court had dismissed the claims against the other Defendants.) Plaintiffs' evidence in response to Doig's motion consisted primarily of an expert report from Bartlow purporting to authenticate the painting as Doig's; a report by Victor Wiener, an art appraiser, assessing the value of the

work under the assumption that it had been painted by Doig; Fletcher's recollections that he had met Doig at Lakehead and later purchased the painting from him; and Fletcher's assertion that, based on the mannerisms, facial features, and hand gestures he observed in YouTube videos of Doig taken after he had become a famous artist, the man depicted in the videos was the man Fletcher had known in Thunder Bay in the 1970s and who had created the painting. Doc. 160-4 at 54-55 (126:1-131:2); Doc. 185 at 4-10; Doc. 185-1 at p. 8, ¶ 16.

The court denied the summary judgment motion. The court explained that it could not find, on the summary judgment record, that Doig absolutely was in Toronto (and therefore not in Thunder Bay) from the summer of 1976 to the fall of 1977. Doc. 273-6 at 148 (61:15-17). The reason was that his school records showed a gap from 1976 to 1977, and the court could not, through the lens required at summary judgment, accept as true the assertions of Doig's family members over Fletcher's personal recollections. *Id*. at 148-53 (61:15-66:7). The court added that Plaintiffs had offered expert testimony supporting Doig's authorship of work, including Wiener's expert opinion, which—though it was offered to prove the value of the painting—could also be taken as authentication evidence given that it noted similarities between the painting at issue and Doig's known works. *Id*. at 155 (68:2-9). And, significantly, the court noted "Fletcher's averments regarding the author's facial features, hand gestures, and mannerisms being the same as what he saw of Doig; and whether it was a video from the '80s or from the aughts doesn't matter. People maintain the same mannerisms—or they often maintain the same mannerisms throughout their life, so that doesn't matter." *Id*. at 153 (66:1-7).

The court held a bench trial in August 2016 and returned a verdict for Doig. Doc. 260. In reaching the verdict, the court made various findings of fact, including that Doig did not paint the painting and—though it was not necessary to reach the verdict—that Doige did paint it.

Doc. 273-8 at 1991 (1990:21-25). After the verdict, Defendants moved for sanctions against Plaintiffs and Zieske, noting the Rule 11 correspondence served on Plaintiffs and Zieske at the outset of the litigation. Doc. 273 at 2. Shortly thereafter, Zieske withdrew as counsel for Plaintiffs. Doc. 279. Fletcher proceeds *pro se*, while Bartlow Gallery (an entity that cannot proceed *pro se*) has not obtained representation.

**Discussion**

As noted, Doig moves for sanctions against Plaintiffs and Zieske under Rule 11, 28 U.S.C. § 1927, and the court's inherent authority.

## I.      Whether Sanctions Are Warranted

"Rule 11(b) prohibits the filing of frivolous claims, and when a frivolous claim is made, Rule 11(c)(1) gives the court discretion to 'impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.'" *United States v. Rogers Cartage Co.*, 794 F.3d 854, 863 (7th Cir. 2015) (quoting Fed. R. Civ. P. 11(c)(1)). Rule 11 asks "whether the party or attorney made a reasonable inquiry into the facts, and whether the party or attorney made a reasonable inquiry into the law." *Ins. Benefit Adm'rs, Inc. v. Martin*, 871 F.2d 1354, 1358 (7th Cir. 1989). Significant here, while a primary objective of Rule 11 is to ensure parties and attorneys make a reasonable inquiry into the facts before commencing litigation, it also "emphasizes the duty of continuing candor by subjecting litigants to potential sanctions for insisting upon a position after it becomes untenable." *Noe v. Interstate Brands Corp.*, 188 F.R.D. 513, 515 (S.D. Ind. 1999); *see also Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (affirming Rule 11 sanctions where a lawyer "continued to advocate a claim that had no legal basis and refused to alter or withdraw it when that deficiency was pointed out"); *Egan v. Maguire*, 338 F. Supp. 3d 799, 804 (N.D. Ill. 2018) ("[W]hen a lawyer learns during

discovery that his client's case against one defendant has fallen apart, the only proper course is to dismiss that defendant."). This continuing duty is explicit on the face of the rule, which provides that a party or lawyer may face sanctions for "later advocating" a position that falls short of Rule 11's standards. Fed. R. Civ. P. 11(b).

Section 1927 provides that "[a]ny attorney … who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. To show that a lawyer is liable under § 1927, "[s]ubjective bad faith" need be shown only where "the conduct under consideration had an objectively colorable basis." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 614 (7th Cir. 2006). "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Riddle & Assocs., P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005); *see also Dal Pozzo*, 463 F.3d at 614 ("The standard for objective bad faith does not require a finding of malice or ill will; reckless indifference to the law will qualify."); *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir. 1985) ("[A] lawyer engages in bad faith by acting recklessly or with indifference to the law, as well as by acting in the teeth of what he knows to be the law."). And as with Rule 11, while an attorney may commence a case with an objectively reasonable basis, "dogged pursuit of a colorable claim becomes actionable bad faith [under § 1927] once the attorney learns (or should have learned) that the claim is bound to fail." *TCI Ltd.*, 769 F.2d at 445.

In addition to Rule 11 and § 1927, a district court has inherent authority "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *see also Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980)

13

(describing the "'well-acknowledged' inherent power of a court to levy sanctions in response to abusive litigation practices") (internal quotation marks omitted). "Sanctions imposed pursuant to the district court's inherent power are appropriate where a party has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Tucker v. Williams*, 682 F.3d 654, 661-62 (7th Cir. 2012); *see also Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016). This power is "permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (internal quotation marks omitted).

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44; *see also Mach v. Will Cnty. Sheriff*, 580 F.3d 495, 502 (7th Cir. 2009) ("A district court should be cautious when exercising … inherent authority."). The inherent power should be used "sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation … , and (2) not adequately dealt with by other rules." *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co.*, 313 F.3d 385, 391 (7th Cir. 2002); *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power."). "But if in the informed discretion of the court, neither [a] statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50. That authority is properly exercised under circumstances where "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address," because "requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent

14

power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves." *Id*. at 51. For this reason, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Id*. at 49; *see also Mach*, 580 F.3d at 502.

Defendants contend that Plaintiffs and Zieske initiated this lawsuit without an objectively reasonable basis and made reckless or misleading allegations in the complaint. Doc. 273-1 at 46, 51-52. The complaint alleged that Doig had painted the disputed work despite it being signed "Doige"; it alleged that Plaintiffs could not find other persons named "Peter Doige" in Canada even though simple internet searches revealed otherwise; and it claimed that Doig had been incarcerated for LSD possession and wished to deny authorship of the painting to hide his past. And Defendants are correct that making reckless claims in a complaint may warrant sanctions. *See Egan v. Pineda*, 808 F.3d 1180, 1180 (7th Cir. 2015) ("Bad faith can be recklessly making a frivolous claim.") (internal quotation marks omitted).

While the court agrees that Plaintiffs and Zieske could have investigated further before filing suit, it cannot say with the requisite level of confidence that they initiated the suit without an objectively reasonable basis. Fletcher possessed a painting authored by a "Pete Doige"—a name similar to "Peter Doig," a renowned artist who in his teens spent some time living in Canada—and the painting arguably possesses some artistic similarities to Doig's known works. Fletcher attempted to authenticate the painting by mining his memories, while Bartlow attempted to do so by contacting Doig and his family. Although Plaintiffs' pre-suit authentication efforts did not succeed, the court cannot say that Plaintiffs and Zieske did not make a reasonable inquiry into the facts prior to commencing this litigation.

15

Shortly after filing suit, however, Plaintiffs and Zieske should have begun to have substantial doubt about their claims. In June 2013, Defendants served Plaintiffs with Rule 11 correspondence providing evidence from Lakehead University strongly suggesting that Doig never attended and evidence from the Royal Canadian Mounted Police indicating that Doig had no criminal record in Canada. In August 2013, Defendants provided an affidavit from Doige's sister, Bovard, casting greater doubt on Plaintiffs' claims and strongly suggesting that Doige created the work. Bovard explained that Doige had attended Lakehead in the 1970s and provided a copy of his student ID card—bearing his name, photograph, and signature—as well as other identification cards bearing his name and photograph.

Given this evidence, and as noted, the court asked Plaintiffs (via Zieske) at a September 2013 status hearing whether they wanted to put the brakes on the litigation, reminding them that a suit can become objectively unreasonable after filing even if it had been commenced with an objectively reasonable basis. Zieske's response was that there were "other people related to [Doige] who say that it's impossible for him to have been in Thunder Bay." Doc. 273-6 at 7. In no uncertain terms, Zieske conveyed (incorrectly, it turned out) that Plaintiffs possessed evidence undermining Bovard's account.

By May 7, 2014, at the latest, it should have become indisputably clear to Plaintiffs and Zieske that their claims stood no chance of success and, in fact, that the claims were factually meritless. On that day, Zieske explained to the court that Doige's mother would not cooperate and that Bovard was a witness for Defendants (as her August 2013 affidavit made clear). By that point, Plaintiffs and Zieske should have realized that there were no "other people related to [Doige]" that would undermine Bovard's account or otherwise overcome Defendants' evidence that Doig never attended Lakehead or spent any time in Canadian prison; they also should have

16

recognized that Doige, in fact, was the person whom Fletcher had met in Thunder Bay and who had created the painting. To continue the litigation past that point was objectively unreasonable, as the complaint's central allegations had completely unraveled under the weight of contrary evidence. Sanctions are accordingly warranted for Plaintiffs' and Zieske's continuing this litigation from May 7, 2014 through the entry of judgment. *See Egan*, 338 F. Supp. 3d at 803-04 (sanctioning a lawyer who continued to litigate even after discovery made clear that his client's claims had no factual merit); *In re Meier*, 223 F.R.D. 514, 519 (W.D. Wis. 2004) (sanctioning a lawyer who "persist[ed] in [her client's] claims" even after opposing counsel pointed out an irresolvable flaw in them).

While Plaintiffs and Zieske should have known that their claims were meritless and stood no chance of success by May 7, 2014, later developments only served to underscore the total implausibility of their claims and to evince their unwillingness to even entertain contrary evidence. Most troublingly, Doig provided Plaintiffs with a list of individuals who could testify to his whereabouts during the relevant time period, yet Plaintiffs did not seek evidence from any of them. *See City of Livonia Emps.' Ret. Sys. v. Boeing Co.*, 306 F.R.D. 175, 182 (N.D. Ill. 2014) (issuing sanctions where "[t]he information turned out to be blatantly false, and if counsel had made any attempt to verify the information, they would have easily discovered this"); *cf. Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1198 (7th Cir. 1987) ("The ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist is as unprofessional as it is pointless.").

Zieske's primary argument against sanctions is that this suit remained objectively reasonable through judgment because it survived summary judgment in April 2016 and proceeded to trial. Doc. 283 at 13-14, 21-22. That Plaintiffs' claims survived summary

17

judgment means that the court concluded that a plaintiff's verdict was reasonably possible when viewing the summary judgment record in the light most favorable to Plaintiffs. The basis for the court's denial of summary judgment, far from being a mystery, was exceptionally clear. The court could not have awarded summary judgment to Defendants given the evidence adduced by Plaintiffs—especially Fletcher's assertion that he had seen video interviews of Doig and, based on Doig's mannerisms and gestures in the video, that Doig was the person who had he met in Thunder Bay in the 1970s and who had authored the painting.

The fact that a claim survives summary judgment, however, is not a shield against sanctions for pressing the claim. *See LeBeau v. Libbey-Owens-Ford Co.*, 799 F.2d 1152, 1158 n.7 (7th Cir. 1986) (rejecting the position "that no suit that survives a motion for summary judgment can ever be found frivolous"); *Media Duplication Servs., Ltd. v. HDG Software, Inc.*, 928 F.2d 1228, 1240 n.10 (1st Cir. 1991) ("[S]uccessful opposition to a summary judgment motion does not always conclusively establish the reasonableness of the claim in question."); *Lemaster v. United States*, 891 F.2d 115, 121 (6th Cir. 1989) ("[M]ere survival of a summary judgment motion, in which all facts are construed in the non-movant's favor, does not insulate the party from sanctions if it is later determined that all factual claims were groundless."); *Calloway v. Marvel Ent. Group*, 854 F.2d 1452, 1472-73 (2d Cir. 1988) (holding that the denial of the defendants' summary judgment motions did not shield the plaintiff's attorney from Rule 11 sanctions), *rev'd in part on other grounds*, 493 U.S. 120 (1989). That is the case here.

At summary judgment, the court did not and could not view the evidence through the lens of a factfinder at trial. Nor did or could the court negatively assess either Fletcher's credibility in asserting that the person (Doig) he saw in the videos was the same person who created the painting or that of Plaintiffs' other witnesses. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Cent. States, Se. & Sw. Areas Pension Fund v. Neiman*, 285 F.3d 587, 595 (7th Cir. 2002) (holding that a judge may find a witness lacks credibility at a bench trial but not at summary judgment). Rather, the court was required to accept Plaintiffs' evidence on its face, which resulted in genuine and material factual disputes with the evidence adduced by Defendants.

All that said, Plaintiffs should have known by May 2014 that their primary evidence—Fletcher's recollections, at that point—was irreparably shaky and, in fact, wrong. Given the evidence that Defendants had marshaled by that date—much of it from neutral sources in Canada, showing that it was Doige, not Doig, whom Fletcher knew in Thunder Bay and who created the painting—Fletcher could not reasonably have believed that his identification of Doig as the painter was accurate, Bartlow could not reasonably have believed that his analysis of the painting (later entered as expert testimony) as Doig's was sound, and Zieske could not reasonably have believed either of those things. *See Lemaster*, 891 F.2d at 121 ("If a party loses because its witnesses were deemed incredible, and it is apparent to a party considering the case that the witness testimony is unbelievable, the offering party cannot reasonably think the credibility issues will be resolved in its favor.").

Zieske suggests that sanctions may be imposed for claims surviving summary judgment only where a plaintiff's only evidence was a "self-serving and unsupported affidavit with no independent evidence." Doc. 283 at 14. The court can discern no rule in governing precedent that sanctions are warranted for cases surviving summary judgment only in such circumstances. And even if that were the rule, this case would fit the bill. Plaintiffs' primary evidence came

19

from Bartlow and Fletcher, whose testimony was necessarily self-serving given their stake in the case. The remainder of Plaintiffs' case consisted largely of attempts to poke holes in Doig's story as to his whereabouts in the 1970s. Even if Plaintiffs succeeded in poking some such holes—which is entirely expected for events occurring some forty years earlier—those holes could not reasonably imply that Doig, not Doige, was the painting's author. To be clear, the court does not suggest that there is anything inherently wrong with Bartlow and Fletcher offering "self-serving" testimony. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) ("[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). The point is that no reasonably objective person—viewing the case as a trier of fact—could have expected as of May 2014 that Plaintiffs' story would prevail over Doig's. A further and perhaps more important point is that the evidence adduced by Defendants by that point would have led any reasonable person in Fletcher's and Bartlow's shoes to reconsider what at the case's inception might have been a sincere belief that Doig authored the painting and to recognize that the author surely was Doige, not Doig.

Defendants ask the court to sanction Plaintiffs and Zieske for conduct other than failing to withdraw their claims, including Plaintiffs' pre-litigation attempts to (in Defendants' view) extort Doig and his family, Plaintiffs' and Zieske's alleged failure to adequately investigate prior to filing suit, Plaintiffs' alleged alterations to their claims after receiving evidence from Defendants, and Zieske's alleged discovery abuses. Doc. 273-1 at 42-59. The cited conduct present non-frivolous bases for sanctions, but it is not the conduct for which the court imposes sanctions. Rather, the court imposes sanctions specifically for Plaintiffs' and Zieske's decision to continue this litigation past May 7, 2014, by which time it should have been absolutely clear

to them that their claims were factually meritless and stood no chance of success. Still, the other conduct cited by Defendants underscores the conduct for which Plaintiffs and Zieske are sanctioned, and it is consistent with the court's determination that they either ignored or turned a blind eye to the fact that their claims were meritless.

In sum, Plaintiffs and Zieske either knew or should have known by May 7, 2014, that they had no objectively reasonable basis for their claims and that it was unreasonable for them to continue with the suit. Sanctions are proper under Rule 11 (as to Plaintiffs) and Rule 11 and § 1927 (as to Plaintiffs and Zieske). The court does not impose sanctions under its inherent authority because Rule 11 and § 1927 are adequate to impose sanctions for the entire period that Plaintiffs and Zieske continued litigating even after it had become objectively unreasonable to do so. *See Rogers Cartage*, 794 F.3d at 863 (holding that the district court abused its discretion where it imposed sanctions under its inherent authority where Rule 11 was adequate).

The "safe harbor" provision of Rule 11(c)(2) does not preclude Rule 11 sanctions, as Dontzin and the Dontzin Law Firm served a Rule 11 motion in September 2013 before moving for sanctions. *See Ardisam, Inc. v. Ameristep, Inc.*, 343 F. Supp. 2d 726, 731 (W.D. Wis. 2004) ("Although a party may file a Rule 11 motion after a court enters judgment, the party must have served the alleged violator at least 21 days before the entry of judgment."). In any event, neither Plaintiffs nor Zieske contend that Defendants failed to satisfy Rule 11(c)(2)'s service or any other safe harbor requirement, thereby forfeiting any such contention. *See Methode Elecs., Inc. v. Adam Techs., Inc.*, 371 F.3d 923, 927 (7th Cir. 2004) (suggesting that arguments based on Rule 11's safe harbor provision can be forfeited); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 396 (4th Cir. 2004) (en banc) (holding that Rule 11's safe harbor provision is not jurisdictional and therefore may be forfeited); *In re Kitchin*, 327 B.R. 337, 362 (Bankr.

21

N.D. Ill. 2005) (holding that a party waived an analogous provision of the Bankruptcy Rules).

Nor do Plaintiffs or Zieske dispute that the September 2013 service by Dontzin and the Dontzin

Law Firm satisfies the requirement as to all Defendants, who join the present motion, thereby

forfeiting that point as well.

## II.    Sanctions Amount

For a Rule 11 violation, the court may "order … payment to the movant of part or all of

the reasonable attorney's fees and other expenses directly resulting from the violation."

Fed. R. Civ. P. 11(c)(4); *see Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1031 (7th Cir. 1999)

(explaining that, "[i]n using attorneys' fees to determine the amount of sanctions, that amount

must be limited to fees incurred as a direct result of" the Rule 11 violation).  Likewise, § 1927

authorizes the court to aware costs and fees incurred "because of" a lawyer's sanctionable

conduct.  28 U.S.C. § 1927; *see Shales v. Gen. Chauffeurs*, 557 F.3d 746, 749 (7th Cir. 2009)

(analogizing § 1927 to an intentional tort for which damages are compensatory in nature).

The court ordered Defendants to submit evidentiary support for the attorney fees and

non-taxable costs and expenses incurred from May 7, 2014 through the entry of judgment, and it

ordered Plaintiffs and Zieske to respond with challenges to the reasonableness of Defendants'

requested fees and costs.  Docs. 261, 391.  Defendants submitted a memorandum itemizing their

fees and costs, Doc. 394, and Zieske responded, Doc. 406.  Fletcher also filed a response *pro se*,

though it is unresponsive to the reasonableness of the claimed fees and costs, Docs. 402-403,

while Bartlow Gallery, without representation, did not respond.

Zieske contends that he cannot meaningfully respond to Defendants' itemized fees and

costs because he did not know which conduct would provide the basis for sanctions.  Doc. 406 at

3-6.  The argument rests on the legal premise just explained, that a sanction ordering a party or

lawyer to pay his adversary's fees and costs may be imposed only for fees and costs incurred because of the sanctionable conduct. But Zieske is wrong that he could not meaningfully respond to Defendants' itemized fees and costs. The court told Zieske that he "should assume that the court will find that sanctions are warranted for the post-5/7/2014 time frame." Doc. 398. That meant that Zieske should explain whether the fees and costs incurred by Defendants after May 7, 2014 were reasonable—plainly indicating that the court would find that reasonable fees and costs incurred after that date directly resulted from his sanctionable conduct (continuing the litigation).

Defendants request attorney fees in the amount of $2,799,221.25 ($2,731,311.75 from Dontzin Nagy & Fleissig LLP, and $67,909.50 from Agrawal Evans LLP) and non-taxable costs and expenses in the amount of $610,398.90. Doc. 394 at 2. Zieske raises several disputes as to the reasonableness of those claimed fees and costs. First, he argues that the billing rates charged by Dontzin Nagy & Fleissig LLP, a New York firm, are unreasonable. Doc. 406 at 10. The firm's hourly rates ranged from $475 to $1,050 for attorneys and $200 to $225 for legal assistants. *Ibid.*; Doc. 394 at 2-4. Zieske contends that those rates are unreasonable based on one recent decision's finding that the average hourly late for a lawyer engaged in civil litigation in Chicago is $297. *See Sonrai Sys., LLC v. Romano*, 2022 WL 4551893, at *8 (N.D. Ill. Sept. 29, 2022).

The court disagrees that the hourly rates charged by Dontzin Nagy & Fleissig LLP were unreasonable. It would be inappropriate to find that the average rate should obtain in a case that is far from average. This case required expertise in art law and demanded resources and legwork to identify persons who could shed light on Doig's whereabouts and activities four decades ago. The complaint sought a damages award of an undetermined amount "to exceed $1 million,"

Doc. 1 at ¶ 62, and Plaintiffs ultimately requested $7,900,000 in damages, Doc. 273-8 at 1943 (1942:15-20). The nature of the case was therefore not ordinary, and above-average rates are wholly justified. *See Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1183 (7th Cir. 2020) (affirming fees awarded at a rate of $1,000 per hour in an intellectual property royalties dispute); *Prather v. Sun Life & Health Ins. Co. (U.S.)*, 852 F.3d 697, 700 (7th Cir. 2017) (affirming fees at a rate of $620 per hour in an insurance case); *Mullen v. GLV, Inc.*, 2022 WL 4534789, at *7 (N.D. Ill. Sept. 28, 2022) (awarding fees at a rate of $800 per hour in a fraud case); *see also Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982) (awarding fees for attorneys based in New York and Washington, D.C., for a case litigated in South Bend because "[t]he complexity and specialized nature of a case may mean that no attorney, with the required skills, is available locally"). Nor should Defendants have been expected to use only local counsel when they did not choose this forum—and indeed where they attempted to get the case dismissed based for lack of personal jurisdiction and *forum non conveniens*. Docs. 22, 26, 34. Three of the four Defendants reside in New York, while Doig resides in Trinidad and Tobago. Doc. 1 at ¶¶ 4-7.

Zieske also argues that Dontzin Nagy & Fleissig LLP's fee invoices are plagued with block billing and vague descriptions of the tasks performed, making it impossible to determine the reasonableness of the charges. Doc. 406 at 11. There is nothing about block billing that necessarily precludes the recovery of attorney fees. *See Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006) ("Although 'block billing' does not provide the best possible description of attorneys' fees, it is not a prohibited practice."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more."). In any event, block billing and

vague entries are not as pervasive as Zieske suggests; while he identifies some entries that could have been more precise, Doc. 406 at 11-12; Doc. 406-2, the vast majority of the time entries are detailed and particularized to the work performed, Doc. 394-2 at 38-270.

A problem that Zieske does identify is the entry of 70 hours by one Dontzin Nagy & Fleissig LLP lawyer on a single day, April 1, 2016. *Id*. at 151; Doc. 406 at 9. The $40,250 charged for those 70 hours (at $575 per hour) should be deducted. Defendants contend that this amount was already deducted from their bill pursuant to a $500,000 credit that the law firm provided to Defendants on the September 27, 2016 invoice. Doc. 408 at 4 n.4. But the court cannot confirm that that credit was intended to compensate for the 70-hour entry error.

And while the court finds that Dontzin Nagy & Fleissig LLP's hourly rates and billing practices were not unreasonable as a general matter, the firm in some instances billed more than was reasonably necessary for certain tasks and engaged in some billing practices that preclude meaningful review of their reasonableness. Given the court's overall sense of the litigation and careful review of the bills, the remaining Dontzin Nagy & Fleissig LLP fees are reduced by an additional 20% to account for the unnecessary work and opaque bills. *See Vega v. Chi. Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021) ("[T]he [Supreme] Court has noted that district courts may consider their overall sense of the suit and may use estimates in calculating and allocating an attorney's time.") (internal quotation marks omitted); *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("The district court acted within its discretion when it chose to cut the number of hours by a lump sum in response to appellees' claim that the time was inflated. We endorse the court's approach as a practical means of trimming fat from a fee application; it is generally unrealistic to expect a trial court to evaluate and rule on every entry in an application."). The court therefore finds that the reasonable fees charged by Dontzin Nagy & Fleissig LLP are

$2,152,849.40. (The $2,731,311.75 charged, less the $40,250 billing error, less 20% of the remaining $2,691,061.75).

Neither Zieske nor Plaintiffs contend that Agrawal Evans LLP's fees were unreasonable. The court has reviewed the invoices submitted by that firm, and it finds that the $67,909.50 that it charged Defendants was reasonable.

Finally, there is Defendants' claim for $610,398.90 in non-taxable costs. Zieske observes that Defendants' evidentiary support for those costs does not include detailed descriptions of the expenditures. Rather, Defendants provide a report providing the category ("Meals," for example), date, and cost of an expenditure. Doc. 394-2 at 272-297. Without providing specifics as to the purpose of each expense, it is impossible to confirm whether a particular expenditure was reasonable. At the same time, it is beyond dispute that many of the costs must have been reasonable, even if the court cannot say which ones. For example, Defendants had to spend considerable resources attempting to find persons throughout Canada who might confirm Doig's whereabouts in the 1970s.

In recognition of the fact that much of the costs identified by Defendants must have been reasonable, as well as the fact that it is Defendants' burden to substantiate the costs, it is appropriate to award Defendants' 50% of their claimed non-taxable costs and expenses, which amounts to $305,199.45. *See United States ex rel. Use & Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.*, 95 F.3d 153, 173 (2d Cir. 1996) (affirming an award of $5,000 for photocopying costs where the movant had requested nearly $20,000 but failed to itemize the costs or explain why they were necessary); *see also Francois v. Mazer*, 523 F. App'x 28, 29 (2d Cir. 2013) ("[W]hen items are insufficiently itemized or not supported by an

explanation as to why such expenditures were necessary, the court may reduce the total amount awarded based on the court's estimate of those expenditures.").

Zieske cites *Lawrence E. Jaffe Pension Plan v. Household International, Inc.*, 2014 WL 1097471 (N.D. Ill. Mar. 20, 2014), to argue that the relative lack of supporting evidence requires the court to deny recovery of non-taxable costs entirely. In *Jaffe*, the court denied costs for exemplification and copying under 28 U.S.C. § 1920 because the movant's documentation did not allow the court to determine whether the expenditures had been incurred necessarily or merely for the movant's own convenience. *Id*. at *3-4; *see also Collins v. Gorman*, 96 F.3d 1057, 1058 (7th Cir. 1996) (reversing the district court order granting a bill of costs in total where the supporting documentation did not allow the district court to determine which costs were permitted under § 1920). That differs from this case, where it is clear that much of Defendants' expenditures were necessary. *Cf. Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006) ("The proper remedy for omitting evidence of billing judgment does not include a denial of fees but, rather, a reduction of the award by a percentage intended to substitute for the exercise of billing judgment.").

Adding the $2,152,849.40 for the Dontzin Nagy & Fleissig LLP fees, $67,909.50 for the Agrawal Evans LLP's fees, and $305,199.45 in non-taxable costs and expenses, the court imposes on Plaintiffs and Zieske a sanction of $2,525,958.35 to be paid to Defendants. Because sanctions are warranted against Plaintiffs (under Rule 11) and Zieske (under Rule 11 and § 1927), Plaintiffs and Zieske are jointly and severally liable for that amount. *See Matlin*, 979 F.3d at 1180 (affirming sanctions imposed jointly and severally on parties and their counsel under Rule 11).

One issue remains. Zieske contends that various equitable considerations—that he is a solo practitioner and has a family to support—require the court to lessen the sanction imposed. Doc. 406 at 15-16. Zieske is correct that the court may take into account equitable considerations, such as a lawyer's ability to pay, when issuing sanctions under Rule 11. *See Brown v. Fed'n of State Med. Bds. of the U.S.*, 830 F.2d 1429, 1439 (7th Cir. 1987) ("[I]n appropriate cases, a district court should reflect upon equitable considerations in determining the amount of the sanction."). The problem with Zieske's argument, however, is that he is also sanctioned under § 1927, which leaves the court with no such equitable discretion. *See Shales*, 557 F.3d at 749 ("[A] lawyer's ability to pay does not affect the appropriate award for a violation of § 1927."). And neither Fletcher nor Bartlow Gallery contend that sanctions should be reduced to account for their ability to pay.

### Conclusion

Defendants' motion for sanctions is granted in part and denied in part. Plaintiffs and Plaintiffs' counsel, Zieske, shall pay Defendants $2,525,958.35 in sanctions. Plaintiffs and Zieske are jointly and severally liable for the sanctions. Zieske's motion to strike Defendants' reply to his response to Defendants' itemization of their costs, Doc. 410, is denied as moot because the reply did not affect the court's ultimate conclusion as to the appropriate amount of sanctions.

December 30, 2022

_____
United States District Judge